FILED

11/01/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 17-0358

OP 17-0358

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 267

MONTANA ASSOCIATION OF COUNTIES ("MACo"),
LEO GALLAGHER, ADRIAN M. MILLER,
MONTANA ASSOCIATION OF CRIMINAL DEFENSE
LAWYERS, and ACLU OF MONTANA FOUNDATION, INC.,

Petitioners,

v.

THE STATE OF MONTANA, by and through
TIMOTHY C. FOX, in his official capacity as
Attorney General, and COREY STAPLETON,
in his official capacity as Secretary of State,

Respondents.

ORIGINAL PROCEEDING:     Constitutional Initiative 116

COUNSEL OF RECORD:

      For Petitioners:

            Kyle Anne Gray, Brianne C. McClafferty, Holland & Hart LLP, Billings, Montana

            James P. Molloy, Gallik, Bremer & Molloy, P.C., Bozeman, Montana
            (*Attorneys for MACo*)

            Alex Rate, Legal Director, ACLU of Montana Foundation Inc., Missoula, Montana
            (*Attorney for ACLU of Montana Foundation, Inc.*)

      For Respondents:

            Timothy C. Fox, Montana Attorney General, Dale Schowengerdt, Solicitor General, Rob Cameron, Deputy Attorney General, Helena, Montana

For Amici:

Maxon R. Davis, Tyler C. Smith, Davis, Hatley, Haffeman & Tighe, P.C., Great Falls, Montana

Kathleen M. Sullivan (*Pro Hac Vice*), Christine H. Chung (*Pro Hac Vice*), Quinn, Emanuel, Urquhart & Sullivan, LLP, New York, New York (*Attorneys for Marsy's Law for Montana, LLC*)

Martha Sheehy, Sheehy Law Firm, Billings, Montana (*Attorney for "The Montana Newspapers"*)

William V. Ballew, Spoon Gordon Ballew PC, Missoula, Montana (*Attorney for National Crime Victim Law Institute*)

Lawrence A. Anderson, Attorney at Law, P.C., Great Falls, Montana

James H. Goetz, Goetz, Baldwin & Geddes P.C., Bozeman, Montana (*Attorneys for Constitutional Convention Delegates, Retired Montana Supreme Court Justices and Law Professors*)

Decided: November 1, 2017

Filed:

_____
Clerk

**OPINION AND ORDER**

Justice Laurie McKinnon delivered the Opinion and Order of the Court.

¶1 Petitioners challenge the constitutionality of Constitutional Initiative 116 (CI-116), commonly known as Marsy's Law, in an original petition for declaratory judgment and injunctive relief. The merits of CI-116 and the policy choices behind it are not at issue in this case. The only question before this Court is whether the procedure by which CI-116 was submitted to voters conformed to Montana's constitutional requirements.

¶2 This Court has original jurisdiction over declaratory judgment actions "when urgency or emergency factors exist making litigation in the trial courts and the normal appeal process inadequate and when the case involves purely legal questions of statutory or constitutional interpretation which are of state-wide importance." M. R. App. P. 14(4). *See also* Mont. Const. art. VII, § 2(1)-(2); §§ 3-2-201 and -202(1), MCA. In this case, normal litigation and appeal processes are inadequate because implementation of CI-116 is imminent. Furthermore, the question of whether CI-116 violates the Montana Constitution involves purely legal questions of constitutional interpretation because analysis of Montana Constitution, Article XIV, Section 11's separate-vote requirement focuses on the manner in which a constitutional amendment is submitted to the voters at an election. What is in issue and what this Court must adjudge is not directed by a factual record or inquiry, but rather is directed to the legality of the enactment or adoption process itself. Indeed, it is precisely because we are addressing only the enactment process and whether that process survives constitutional scrutiny that a factual record evidencing a dispute or conflict surrounding the numerous provisions of CI-116 is

3

unnecessary.  Thus, this case is properly before the Court as an original proceeding and we accordingly accept jurisdiction.  *See Marshall v. State*, 1999 MT 33, ¶ 5, 293 Mont. 274, 975 P.2d 325.

¶3     We conclude that the single-subject requirement, set forth in Article V, Section 11(3), of the Montana Constitution, applies to bills of the Legislature and not to constitutional amendments.  We further conclude that CI-116 violates the separate-vote requirement, set forth in Article XIV, Section 11, of Montana's Constitution, and is therefore void in its entirety.

¶4     We restate the dispositive issue as whether CI-116 violates the separate-vote requirement contained in Montana Constitution, Article XIV, Section 11.

### FACTUAL AND PROCEDURAL BACKGROUND

¶5     On November 8, 2016, a majority of Montana voters approved CI-116, a constitutional amendment proposed by popular initiative.  As enacted, CI-116 amended Article II of Montana's Constitution by adding a new Section 36, titled Rights of Crime Victims.[1]  By way of description, CI-116 contains four sections.  CI-116(1) enumerates eighteen rights to which crime victims are entitled.  These rights are meant "[t]o preserve and protect a crime victim's right to justice, to ensure a crime victim has a meaningful role in criminal and juvenile justice systems, and to ensure that a crime victim's rights and interests are respected and protected by law in a manner no less vigorous than the protections afforded to a criminal defendant and a delinquent youth."  Among some of

---

[1]    The full text of CI-116 is attached as Appendix A and can be found online at https://perma.cc/VQ76-WRAJ.  CI-116 is currently recorded as Article II, Section 36, of the Montana Constitution (2017).

the rights afforded to victims by CI-116 are the right "to due process," CI-116(1)(a); the right "to privacy, including the right to refuse an interview, deposition, or other discovery request and to set reasonable conditions on the conduct of any interaction to which the victim consents," CI-116(1)(f); the right to "notice of" and to be "present at all proceedings involving the criminal conduct, plea, sentencing, adjudication, disposition, release, or escape of the defendant or youth . . . and any proceeding implicating the rights of the victim," CI-116(1)(g); the right to be "heard in any proceeding involving the release, plea, sentencing, disposition, adjudication, or parole of the defendant or youth," CI-116(1)(i); the right to "proceedings free from unreasonable delay and to a prompt and final conclusion of the case and any related postjudgment proceedings," CI-116(1)(o); and the right to be informed of the enumerated rights and advised that "the victim may seek the advice and assistance of an attorney with respect to" those rights, CI-116(1)(r).

¶6     CI-116(2) provides the manner in which victim's rights are to be recognized and effectuated. A victim, the victim's attorney or representative, or the prosecuting attorney "may assert and seek enforcement of the rights enumerated" in any "trial or appellate court or any other authority with jurisdiction over the case as a matter of right." The court "shall act promptly on the request, affording a remedy by due course of law for the violation of any right. The reasons for any decision regarding disposition of a victim's right must be clearly stated on the record."

¶7     CI-116(3) ensures that the enumerated rights "may not be construed to deny or disparage" other victims' rights and provides that CI-116 "applies to criminal and youth court proceedings, is self-executing, and requires no further action by the Legislature."

5

¶8     CI-116(4) provides definitions for "crime" and "victim."  A "crime" to which a victim's enumerated rights apply includes felonies, misdemeanors, and delinquency proceedings.  The definition of "victim," CI-116(4)(b), includes the victim, who has suffered direct or threatened harm, and his or her "spouse, parent, grandparent, child, sibling, grandchild, or guardian."  Victim also includes someone with a "relationship to the victim that is substantially similar" to the relationship of a spouse, parent, grandparent, child, sibling, grandchild, or guardian.  Finally, "victim" does not include the accused or someone the "court believes would not act in the best interests of a minor or of a victim who is deceased, incompetent, or incarcerated."

¶9     CI-116 was to become effective July 1, 2017.  *Mont. Cnty. Attorneys Ass'n v. State*, No. OP 16-0720, 387 Mont. 534, 391 P.3d 734 (table) (Jan. 3, 2017).  However, on June 20, 2017, the Petitioners, Montana Association of Counties, Leo Gallagher, Adrian M. Miller, Montana Association of Criminal Defense Lawyers, and ACLU of Montana Foundation, Inc. (together, MACo), filed an original petition for declaratory judgment and injunctive relief.  We ordered a response from the State of Montana (State) and additional briefing from the parties.  On June 30, 2017, we stayed implementation of CI-116 to allow thorough consideration of the parties' arguments, relevant case law, and the applicable provisions of Montana's Constitution.

¶10 MACo, supported by amici,[2] requests this Court declare void the enactment of CI-116, enjoin CI-116's implementation and enforcement, and decertify the election results with respect to CI-116. MACo argues CI-116 violates two provisions of the Montana Constitution: the single-subject requirement of Article V, Section 11(3), and the separate-vote requirement of Article XIV, Section 11. MACo reasons CI-116 violates the single-subject requirement because involving a victim's kin in criminal justice decisions is a subject separate from providing rights to traditional victims.[3] Regarding the separate-vote requirement, MACo argues the "extensive language" of CI-116 amends at least eight sections of Montana's Constitution and, thus, a vote was needed to amend each section individually.[4]

¶11 The State, also supported by amici,[5] responds that the single-subject requirement does not apply to constitutional initiatives. Alternatively, the State maintains that crime victims' rights is CI-116's only subject. The State also contends CI-116 does not violate the separate-vote requirement because the initiative does not "change or formally alter" any preexisting constitutional provision. The State further urges this Court to not follow

---

[2] Two groups filed briefs supporting the Petitioners: Constitutional Convention Delegates, Retired Montana Supreme Court Justices, and Law Professors; and "The Montana Newspapers," including Lee Enterprises, The Billings Gazette, The Missoulian, The Helena Independent Record, The Ravalli Republic, The Great Falls Tribune, and The Bozeman Daily Chronicle.

[3] The Petitioners acknowledge that "[e]xtending rights to traditional victims of crime is a single, fairly contained subject."

[4] Specifically, the Petitioners argue CI-116 amends Article II, Section 17's due process guarantee in criminal proceedings; Article VII, Section 2(3)'s grant of power to the Supreme Court to regulate attorney conduct; Article II, Section 9's right to know; Article II, Section 10's right of privacy; Article II, Section 20's initiation of criminal proceedings; Article II, Section 21's right to bail; Article II, Section 24's right to a speedy trial; and Article II, Section 28's principles guiding laws punishing crime.

[5] Two groups filed briefs supporting the State: Marsy's Law for Montana, LLC; and National Crime Victim Law Institute.

the "amendment-by-implication" theory advanced by MACo, but, in any event, maintains that CI-116 does not impliedly amend other parts of the Constitution. Finally, the State contends that construing the separate-vote requirement as MACo requests would essentially abolish the constitutional initiative process in Montana.

**DISCUSSION**

¶12 Montana's Constitution may be amended in three ways, all of which are set forth in Article XIV: (1) by constitutional convention, Mont. Const. art. XIV, §§ 1-7; (2) by legislative referendum, Mont. Const. art. XIV, § 8; and (3) by popular initiative, Mont. Const. art. XIV, § 9. Here we are only concerned with amendment by popular initiative. The people of this State have the "exclusive right of governing themselves as a free, sovereign, and independent state" and "may alter or abolish the constitution and form of government whenever they deem necessary." Mont. Const. art. II, § 2. Where the people, in adopting a constitution, have prescribed the method by which it may be revised or amended, any attempt to amend the fundamental law in violation of a self-imposed restriction is unconstitutional. Accordingly, as long as Montana's Constitution is in effect, "the people may amend the constitution by initiative only in the manner provided by the constitution." *State ex rel. Mont. Citizens for Pres. of Citizen's Rights v. Waltermire*, 227 Mont. 85, 90-91, 738 P.2d 1255, 1258 (1987). The constitutional limitations on the initiative process are important because "[t]he sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed." *Waltermire*, 227 Mont. at 91, 738 P.2d at 1258 (quoting *Hunter v. Erickson*, 393 U.S. 385, 392, 89 S. Ct. 557, 561 (1969)).

8

¶13 Montana's 1972 Constitution provided citizens with a new way to amend their Constitution: by popular initiative. *Compare* Mont. Const. of 1889, art XIX, § 9 *with* Mont. Const. art. XIV, §§ 1-11. The addition was consistent with the overall theme of the 1972 Constitutional Convention of constructing a flexible Constitution subject to popular control. Anthony Johnstone, *The Constitutional Initiative in Montana*, 71 Mont. L. Rev. 325, 341 (2010). The Constitutional Convention Delegates (Delegates) focused on creating a Constitution that would reflect the notions of popular sovereignty and self-government embodied in Article II. Johnstone, *supra*, at 340, 342. The Constitutional Revision Committee (Committee) proposed the initiative power because it believed the power was "an inherent right in a body politic whose Constitution is to be the embodiment of the will of the people." Montana Constitutional Convention, Committee Proposals, February 12, 1972, p. 363 (hereinafter Committee Proposal). The Committee wanted to ensure the 1972 Constitution provided a constitutional revision process that "hit a happy and workable medium." Committee Proposal, p. 364.

¶14 Consequently, while providing for initiative power, the 1972 Constitution also imposed limitations on the initiative process. Such limitations included signature gathering and geographic distribution requirements. Mont. Const. art. XIV, § 9(1). The Committee determined limitations were necessary because it was "not unreasonable to demand strict standards when dealing with something as fundamental and important as Constitutional change." Committee Proposal, p. 363. The Committee noted another check on the constitutional amendment process: the separate-vote requirement. Committee Proposal, p. 363. Indeed, the official voter pamphlet for the new Constitution

explained to voters that the only limit on how constitutional amendments may be submitted at an election was the requirement that each amendment "be clearly designated on the ballot so that they can be voted on separately." Concerned Citizens for Constitutional Improvement, *The Proposed 1972 Constitution for the State of Montana*, Montana Newspapers, 1972, at 5.

¶15 The separate-vote requirement is one of eleven sections in Article XIV directing the manner in which Montana's Constitution may be revised. In particular, the separate-vote requirement pertains to submission of a proposed amendment, providing that if more than one constitutional amendment is presented to voters during the same election, voters must have the option to vote on each amendment separately:

> Submission. If more than one amendment is submitted at the same election, each shall be so prepared and distinguished that it can be voted upon separately.

Mont. Const. art. XIV, § 11.[6] The separate-vote requirement was "designed to aid voters in casting their votes on Constitutional issues, and as a check on the possible action of grouping several issues under one innocuous title." Committee Proposal, p. 363. The separate-vote requirement has a long history in Montana. Montana's 1884[7] and

---

[6] We refer to Montana Constitution, Article XIV, Section 11, as the "separate-vote requirement" throughout this Opinion. We refer to Montana Constitution, Article V, Section 11(3), as the "single-subject requirement" throughout this Opinion.

[7] The 1884 provision was stylistically different than the current provision. It stated, "Should more amendments than one be submitted at the same election, they shall be so prepared and distinguished by numbers or otherwise that each can be voted upon separately." Mont. Const. of 1884, art XVI, § 13.

10

1889[8] Constitutions both contained a separate-vote requirement, and the requirement was adopted unanimously during the Constitutional Convention of 1972. Montana Constitutional Convention, Verbatim Transcript, March 1, 1972, pp. 1195-96. The separate-vote requirement has two well-recognized objectives. The first is to avoid voter confusion and deceit of the public by ensuring proposals are not misleading or the effects of which are concealed or not readily understandable. The second is to avoid "logrolling" or combining unrelated amendments into a single measure which might not otherwise command majority support. By combining unrelated amendments, approval of the measure may be secured by different groups, each of which will support the entire proposal in order to secure some part, even though not approving all parts of a multifarious amendment. *Fugina v. Donovan*, 104 N.W.2d 911, 914 (Minn. 1960). *See also In re Initiative Petition No. 314*, 625 P.2d 595 (Okla. 1980); *Kerby v. Luhrs*, 36 P.2d 549 (Ariz. 1934).

¶16    This Court's interpretation of the separate-vote requirement has narrowed over time as the processes by which the Constitution can be amended have changed. In the early twentieth century, before Montana's Constitution could be amended by initiative, we held the separate-vote requirement satisfied as long as all provisions of the proposed constitutional amendment related to one subject matter or a single plan. *See, e.g., State*

---

[8] Montana's 1889 Constitution contained the exact same provision as the 1884 Constitution but also placed a three-amendment per-election limit. Mont. Const. of 1889, art XIX, § 9. The 1972 Delegates removed the three-amendment per-election limit. Johnstone, *supra*, at 346. The Delegates believed that the people, through the initiative process, should have the freedom to place as many proposed constitutional amendments on the ballot as they wish, as long as voters maintained the ability to vote on each amendment separately. Johnstone, *supra*, at 346 (citing Montana Constitutional Convention, Verbatim Transcript, February 18, 1972, p. 517).

11

*ex rel. Corry v. Cooney*, 70 Mont. 355, 365, 255 P. 1007, 1011 (1924) (concluding the separate-vote requirement satisfied if "the operation of the amendment relates to a single plan or purpose"); *State ex rel. Hay v. Alderson*, 49 Mont. 387, 404, 142 P. 210, 213 (1914) (holding the separate-vote requirement satisfied as long as all parts of the proposed constitutional amendment "may be logically viewed as parts or aspects of a single plan"); *State ex rel. Teague v. Bd. of Comm'rs*, 34 Mont. 426, 430, 87 P. 450, 451 (1906) (holding a proposed amendment constitutional under the separate-vote requirement because it was not "three separate propositions" but instead was "only one matter and one subject").

¶17 We revisited our *Cooney*, *Hay*, and *Teague* separate-vote reasoning and jurisprudence following ratification of the 1972 Constitution and introduction of the petition by popular initiative. Notably, our 1999 decision in *Marshall v. State* overruled *Cooney*, *Hay*, and *Teague* to the extent those decisions failed to recognize a distinction between the single-subject and separate-vote requirements. *Marshall*, ¶ 23. In *Marshall* we explained that a proposed amendment could relate to a single plan or purpose, but still violate the separate-vote requirement because it contained more than one amendment to Montana's Constitution. *Marshall*, ¶ 22. Central to our decision in *Marshall* was the fact that *Cooney*, *Hay*, and *Teague* were decided when constitutional amendments could only be proposed by the Legislature—before Montana's Constitution could be amended by initiative. *Marshall*, ¶ 19. We found this distinction remarkable because when a constitutional amendment is proposed by the Legislature through referendum, representatives debate and deliberate the proposition. *Marshall*, ¶ 19. On the other hand,

12

when a constitutional amendment is proposed by initiative, Montana voters do not have the same opportunity to consider and debate the proposition. *Marshall*, ¶ 19.

¶18 Based on these observations, we noted that the separate-vote requirement "is a cogent constitutional recognition of the circumstances under which Montana voters receive constitutional initiatives." *Marshall*, ¶ 19. Voters do not have the opportunity to consider, discuss, and potentially change constitutional amendments proposed by initiative in the same way the Legislature does those proposed by referendum. Therefore, the separate-vote requirement serves as an important check on the initiative process, confirming the integrity of the vote and ensuring the voters actually approve of a particular amendment. Our interpretation of the separate-vote requirement in *Marshall* ensured Montana voters always have the option to independently select or reject each constitutional amendment, guaranteeing the people have complete control over Montana's fundamental law. *Marshall*, ¶¶ 19, 22.

¶19 Prior to *Marshall* and adoption of our 1972 Constitution, this Court analyzed the separate-vote provision based on whether a proposed constitutional amendment contained one subject or matter. The 1972 Constitution's amendment by initiative interjected a new element into the separate-vote requirement, leading to some confusion regarding the difference between the separate-vote and single-subject requirements. While we distinguished the separate-vote and single-subject requirements in *Marshall*, holding each provision is substantively different, we implied that both provisions apply to constitutional amendments proposed by initiative. *Marshall*, ¶¶ 18, 22. We decided the test for the separate-vote requirement is stricter than that of the single-subject

13

requirement. *Marshall*, ¶ 22. We noted that reading the separate-vote requirement narrower than the single-subject requirement made sense "because the act of amending the constitution is significantly different from enacting or enabling legislation." *Marshall*, ¶ 22. We explained in *Marshall* that a proposed constitutional amendment could satisfy the single-subject requirement but be invalid under the separate-vote requirement. *Marshall*, ¶ 22. Because the Court found CI-75 unconstitutional pursuant to the separate-vote requirement of Article XIV, Section 11, a narrower requirement than the single-subject requirement, we never addressed the applicability of Article V, Section 11(3)'s single-subject requirement.

¶20 We now directly consider whether the single-subject requirement applies to constitutional amendments proposed by initiative and decide that it does not. The Montana Constitution contains both a single-subject requirement for bills proposed by the Legislature, Article V, Section 11(3), and a separate-vote requirement for constitutional amendments, Article XIV, Section 11. The single-subject requirement provides the guidelines by which the Legislature must present bills to the electorate:

> Each bill, except general appropriation bills and bills for the codification and general revision of the laws, shall contain only one subject, clearly expressed in its title. If any subject is embraced in any act and is not expressed in the title, only so much of the act not so expressed is void.

Mont. Const. art. V, § 11(3).

¶21 Montana's single-subject requirement necessitates that bills developed by the Legislature contain only one subject. In contrast, constitutional amendments developed via initiative never go through the Legislature. Therefore, the Legislature has no control

14

over a constitutional amendment proposed by initiative. It follows that Article V, governing the way in which the Legislature prepares and proposes bills, does not also govern constitutional amendments raised by initiative, a power lying exclusively with the people and provided for in Article XIV.

¶22 The Oregon Supreme Court's decision *Armatta v. Kitzhaber*, 959 P.2d 49 (Or. 1998), guided our *Marshall* decision. *Marshall*, ¶ 22. However, the Montana Constitution differs from Oregon's Constitution. Oregon's Constitution has a single-subject requirement that applies directly to constitutional initiatives. Or. Const. art. IV, § (1)(2)(d) ("A proposed law or amendment to the Constitution shall embrace one subject only and matters properly connected therewith."). Conversely, and significant to our analysis here, Montana's Constitution, Article XIV, guiding constitutional revision, does *not* have a single-subject requirement. Montana's single-subject requirement relied on by MACo is contained in Article V, which pertains to the Legislature. To the extent our holding here conflicts with our analysis of the single-subject requirement in *Marshall*, we clarify that the single-subject requirement contained in Article V, Section 11(3), of the Montana Constitution does not apply to constitutional amendments. Nonetheless, the distinction made in *Marshall* between the separate-vote and single-subject requirements, the reasoning in support thereof, and our reliance on *Armatta's* separate-vote analysis were well-reasoned and remain valid. Because we hold that the single-subject requirement does not apply to constitutional amendments, we do not address MACo's contention that CI-116 violates Montana Constitution, Article V, Section 11(3).

¶23    While *Marshall* is significant for its explanation of the separate-vote requirement in the context of an amendment by initiative, particularly in distinguishing the separate-vote requirement from the less arduous single-subject requirement, the Court invalidated CI-75 based on the express language of the initiative itself, which specifically amended other provisions of the Constitution. *Marshall*, ¶ 24. We determined these express amendments each needed a separate vote pursuant to Article XIV, Section 11. *Marshall*, ¶ 24. While explaining that CI-75 also affected other parts of the Constitution by limiting legislative spending, we did not incorporate these implied amendments into our reasoning because our discussion of the three express changes was sufficient to demonstrate CI-75's violation of the separate-vote requirement. *See Marshall*, ¶ 24 n.2. In deciding *Marshall* in this manner, we left unanswered what *is* a "separate amendment" for purposes of the separate-vote requirement.

¶24    Before turning to that question, however, we are compelled to address the State's assertion that we completely rejected the amendment-by-implication theory in *Marshall*. Deciding *Marshall* on alternative grounds, without addressing amendment-by-implication, does not mean we rejected such an analysis. In fact, we left open the possibility in *Marshall* of expanding upon our separate-vote analysis should the need arise, as it has here. *Marshall*, ¶ 24 n.2. More importantly, we conclude our reasoning would be fundamentally flawed if we limited the separate-vote requirement to only those multifarious amendments which expressly refer to other constitutional provisions. Such an interpretation would allow the separate-vote requirement to be easily undermined by simple drafting techniques. In the context of constitutional amendments

16

by initiative, voters act as legislators. It is this Court's obligation to ensure that interest groups and individuals advocating for passage or defeat of a measure do not undermine the right of the voters to decide upon each constitutional change separately, either as a result of expressly incorporating more than one change or doing so by implication. We endeavor now to answer the question left open in *Marshall*; that is, how to determine whether an amendment by initiative contains two or more separate amendments in violation of Montana Constitution, Article XIV, Section 11.

¶25    It is our task to interpret the Constitution by giving "effect to the intent of the people adopting it." *State ex rel. Hinz v. Moody*, 71 Mont. 473, 481, 230 P. 575, 578 (1924). This intent "is to be found in the instrument itself" by looking at "the natural signification of the words employed." *Moody*, 71 Mont. at 481-82, 230 P. at 578-79. The separate-vote requirement states, "If more than one amendment is submitted at the same election, each shall be so prepared and distinguished that it can be voted upon separately." Mont. Const. art. XIV, § 11. The clear import of this provision is that voters must be allowed to express their separate opinion as to each proposed constitutional amendment. Accordingly, this Court is obligated to ensure that voters have the opportunity to cast separate votes for separate amendments. At the same time, we must apply the separate-vote requirement in a manner that does not encumber the right of the people to amend the Constitution.

¶26    There is considerable variance in the way other state courts interpret their separate-vote requirements. *See Cambria v. Soaries*, 776 A.2d 754, 762-65 (N.J. 2000). At one end of the spectrum are states that make only a slight distinction between the

broader single-subject requirement and the separate-vote requirement, requiring the parts be rationally or logically related to each other. *See Fugina*, 104 N.W.2d at 915. Other states have adopted a more narrow interpretation, but are still deferential to the single-subject analysis and do not make a measurable distinction between single-subject and separate-vote requirements. *See, e.g., Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824, 830-31 (Mo. 1990); *Milwaukee Alliance Against Racist and Political Repression v. Elections Bd. of Wis.*, 317 N.W.2d 420, 425 (Wis. 1982); *Carter v. Burson*, 198 S.E.2d 151, 156 (Ga. 1973); *Ohio ex rel. Roahrig v. Brown*, 282 N.E.2d 584, 586 (Ohio 1972). The narrowest interpretation of the separate-vote requirement clearly distinguishes it from the single-subject requirement by requiring there be a single subject to the proposed amendment and parts so interdependent that they constitute a whole and cannot be separated. *See Kerby*, 36 P.2d at 554 ("[T]he different changes contained in the proposed amendment [did not] cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted."). *See also Lee v. Utah*, 367 P.2d 861, 864 (Utah 1962); *Farris v. Munro*, 662 P.2d 821, 825 (Wash. 1983); *Armatta*, 959 P.2d at 63.

¶27    In *Armatta*, which this Court relied upon in *Marshall*, the Oregon Supreme Court concluded the proper inquiry was "whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and that are not closely related." *Armatta*, 959 P.2d at 64. If the "proposal would effect two or more changes that are

18

substantive and not closely related, the proposal violates the separate-vote requirement . . . because it would prevent the voters from expressing their opinions as to each proposed change separately." *Armatta*, 959 P.2d at 64. "In some instances, it will be clear from the text of the proposed initiative whether it runs afoul of [the separate-vote requirement]. In other instances, it will be necessary to examine the implications of the proposal before determining whether it contains two or more amendments." *Armatta*, 959 P.2d at 64.

¶28 We conclude that the proper inquiry is whether, if adopted, the proposal would make two or more changes to the Constitution that are substantive and not closely related. This conclusion is based upon the language of Article XIV, Section 11; our decision in *Marshall* distinguishing between the single-subject and separate-vote requirements in the context of constitutional amendment by initiative; our conclusion that the single-subject requirement contained in Article V, Section 11(3), is inapplicable to constitutional amendments; and the transcripts of the 1972 Constitutional Convention. Furthermore, if a proposed constitutional amendment adds new matter to the Constitution, that proposition is at least one change in and of itself. *See, e.g., Oregon v. Rogers*, 288 P.3d 544, 547 (Or. 2012) (citing *Lehman v. Bradbury*, 37 P.3d 989, 996 (Or. 2002)). Then, "if a measure has the effect of modifying an existing constitutional provision, it proposes at least one additional change to the constitution, whether that effect is express or implicit." *Rogers*, 288 P.3d at 548 (citing *Meyer v. Bradbury*, 142 P.3d 1031, 1036 (Or. 2006)).

¶29 Our separate-vote inquiry begins by focusing on the changes CI-116 makes to the Montana Constitution. We employ well-understood legal meanings in considering

19

whether changes are *substantive*: "[a]n essential part of constituent or relating to what is

essential." *Black's Law Dictionary* 1429 (Henry C. Black ed., 6th ed. 1990).

Additionally, numerous factors may be considered in determining whether the provisions

of a proposed constitutional amendment are "closely related." These factors may

include:

> [W]hether various provisions are facially related, whether all the matters addressed by [the proposition] concern a single section of the constitution, whether the voters or the legislature historically has treated the matters addressed as one subject, and whether the various provisions are qualitatively similar in their effect on either procedural or substantive law.

*McLaughlin v. Bennett*, 238 P.3d 619, 622 (Ariz. 2010) (quoting *Ariz. Together v.*

*Brewer*, 149 P.3d 742, 746 (Ariz. 2007)). The Oregon Supreme Court explained

*Armatta's* "closely related" prong:

> First, we examine the relationship among the constitutional provisions that the measure affects, both explicitly and implicitly. If the affected provisions of the existing constitution themselves are not related, then it is likely that changes to those provisions will offend the separate-vote requirement. That conclusion makes sense, because it is difficult to make **related** changes to **unrelated** constitutional provisions. However, we decline to speculate whether the fact that a proposed amendment affects unrelated provisions of the constitution will be fatal in every case, because, in doing so, we might underestimate the ability of initiative petitioners to design careful, constitutionally sound amendments for the voters to consider. Nonetheless, the fact that a proposed amendment asks the people, in one vote, substantively to change multiple provisions of the Oregon Constitution that are not themselves related is one indication that the proposed amendment might violate the separate-vote requirement.
>
> Next, we must consider the constitutional changes themselves. That is, assuming that the constitutional provisions affected by the measure are related, we must determine whether the changes made to those related constitutional provisions are closely related. If they are closely related, the measure under consideration survives scrutiny under [the separate-vote requirement]. If they are not, it does not.

*Lehman*, 37 P.3d at 998 (emphasis in original; footnote omitted). *See also League of Or. Cities v. Oregon*, 56 P.3d 892, 910 (Or. 2002) (applying the same closely-related analysis to a proposed constitutional amendment).

¶30 Consideration of whether the proposed constitutional changes are closely related gives appropriate effect to the separate-vote requirement by ensuring each constitutional amendment receives its own vote without unduly restricting constitutional change. Other states have applied similar closely-related analyses to proposed constitutional amendments and upheld the amendments as constitutional, demonstrating that a properly constructed constitutional amendment could certainly be found constitutional pursuant to our reasoning today. *See, e.g., Rogers*, 288 P.3d at 552-53 (applying *Armatta's* separate-vote analysis to and upholding a proposed amendment to Oregon's Constitution imposing the death penalty because the changes to multiple areas of the constitution were closely related); *Cambria*, 776 A.2d at 765 (applying *Armatta's* separate-vote analysis to and upholding a proposed amendment to New Jersey's Constitution dedicating revenue streams because the amendment "constitu[ted] a reasonably integrated whole in which the parts are closely related to one another").

¶31 We turn now to the text of CI-116 to determine whether its submission to Montana voters violated the separate-vote requirement. CI-116 expressly amends Article II of the Montana Constitution by adding a new Section 36, providing for specific crime victim rights. Adding a new constitutional provision constitutes one change. CI-116 does not expressly mention, repeal, or otherwise modify any other areas of the Constitution.

21

However, CI-116 implicitly substantively changes multiple provisions of Montana's Constitution, some of which we now discuss.[9]

### A. CI-116(1)(a) Provides a New Due Process Right for Crime Victims.

¶32    Article II, Section 17, of Montana's Constitution provides an individual the right of due process:

> No person shall be deprived of life, liberty, or property without due process of law.

Mont. Const. art. II, § 17.  CI-116 supplements this preexisting provision with another due process right—one exclusive to crime victims.

¶33    The first right CI-116 provides to a crime victim is the right "to due process and to be treated with fairness and respect for the victim's dignity."  CI-116(1)(a).  Accordingly, subsection (1)(a) of CI-116, standing on its own, creates a new due process guarantee for, specifically, crime victims.  This new due process right for crime victims is a change in itself because, unlike our existing due process clause, it identifies a particular group of persons entitled to due process protections.  Identifying and defining a group of persons who are entitled to expressly enumerated due process protections may also implicitly change other areas of the Constitution by effectuating a substantive change which is *not closely related* to a victim's due process right, thus violating the separate-vote requirement.  Although it is difficult to imagine that a proposed provision granting a due process guarantee to crime victims would not be closely related to Montana's existing

_____

[9]  MACo suggests CI-116 makes at least eight implied changes to the Constitution.  While CI-116 would violate the separate-vote requirement if it made only two substantive changes that are not closely related, for purposes of illustration we choose to address six discrete, not closely related, changes CI-116 makes to the Montana Constitution.

grant to persons of a due process guarantee as contained in Montana Constitution, Article II, we decline to speculate on whether submission of only CI-116(1)(a) would violate the separate-vote requirement. By way of illustration, the definition in CI-116 of "crime" and "victim," appears broader through its inclusion of various individuals and types of proceedings than that ascribed to "person" as embodied in our existing constitutional provision. Nonetheless, for purposes of our decision today, it is clear that CI-116 as a whole enumerates many other crime victim rights that are not closely related to our existing due process guarantee contained in Article II, Section 17. Consequently, it is unnecessary to determine whether CI-116(1)(a) is closely related to Article II, Section 17, as CI-116(1)(a) undisputedly adds matter to an existing constitutional provision and constitutes one change in itself.

### B. CI-116(1)(j) and (2) Affect Montana Constitution Article VII, Section 2(3)'s Grant of Power to the Supreme Court to Regulate Attorney Conduct.

¶34 Article VII, Section 2(3), of Montana's Constitution provides the Supreme Court with the authority to "make rules governing . . . admission to the bar and the conduct of its members." A prosecutor, as a member of the bar, must obey the Montana Rules of Professional Conduct (Rules). For example, the Rules prohibit a prosecutor from "prosecuting a charge that the prosecutor knows is not supported by probable cause." M. R. Pro. Cond. 3.8(a).

¶35 The purpose of CI-116 is to provide rights to victims "[t]o preserve and protect a crime victim's right to justice, to ensure a crime victim has a meaningful role in criminal and juvenile justice systems, and to ensure that a crime victim's rights and interests are

23

respected and protected by law in a manner *no less vigorous than the protections afforded to a criminal defendant and a delinquent youth*." CI-116(1) (emphasis added). One of the ways CI-116 effectuates those purposes is by giving a victim the right to "confer with the prosecuting attorney." CI-116(1)(j). CI-116 also provides that "the prosecuting attorney at the request of the victim may assert and seek enforcement of the [victim's] rights . . . ." CI-116(2).

¶36 CI-116 changes a prosecutor's duties in a criminal adjudication. CI-116 requires prosecutors to confer with a victim for the purposes of preserving and protecting the victim's right to justice, ensuring the victim has a meaningful role in the justice system, and ensuring the victim's rights and interests are respected and protected in a manner as vigorous as the protections afforded to a criminal defendant. CI-116 also gives prosecutors the option to, at the victim's request, seek enforcement of the victim's rights. CI-116 changes the way a prosecutor must handle a criminal case in which there is a victim, thus affecting the Supreme Court's power under Article VII, Section 2(3), to make rules governing attorney conduct. We conclude Montana Constitution Article VII, Section 2(3), is substantively changed by CI-116(1)(j) and (2), and that the provisions relating to crime victims' rights are not closely related to this Court's constitutional authority to regulate attorney conduct. Accordingly, asking the people in one vote to substantively change multiple provisions of the Constitution which are not closely related violated the separate-vote requirement.

24

*C. CI-116(1)(g) and (i) Affect Montana Constitution Article II, Section 21's Right to Bail.*

¶37 Article II, Section 21, of Montana's Constitution provides the right to bail:

All persons shall be bailable by sufficient sureties, except for capital offenses, when the proof is evident or the presumption is great.

Mont. Const. art. II, § 21.

¶38 CI-116 affords victims the right to "notice of and to be present at all proceedings involving the . . . release . . . of the defendant or youth," CI-116(1)(g), and the right "to be heard in any proceeding involving the release . . . of the defendant or youth," CI-116(1)(i). Thus, CI-116 changes an accused's right to bail provided in Montana Constitution Article II, Section 21, by constitutionally prohibiting a court from releasing a defendant or youth on bail until all victims, including kinship and those having a "substantially similar relationship" to the victim, are present and heard by the court. CI-116 constitutionally requires a court not release a defendant until the victim appears and is heard, substantively affecting Article II, Section 21's requirement of bail upon sufficient surety. We conclude Montana Constitution Article II, Section 21, is substantively changed by CI-116(1)(g) and (i), because CI-116(1)(g) and (i) add new constitutional requirements to the preexisting bail provision. The constitutional provision regarding an accused's right to bail is not closely related to victims' rights and the separate-vote requirement was violated when voters were asked to consider these multiple amendments in one measure.

*D. CI-116(1)(g) and (i) Affect Montana Constitution Article II, Section 20's Criminal Procedure Rules.*

¶39    Article II, Section 20, of Montana's Constitution provides constitutional guidelines for initiating criminal proceedings:

> (1) Criminal offenses within the jurisdiction of any court inferior to the district court shall be prosecuted by complaint. All criminal actions in district court, except those on appeal, shall be prosecuted either by information, after examination and commitment by a magistrate or after leave granted by the court, or by indictment without such examination, commitment or leave.

> (2) A grand jury shall consist of eleven persons, of whom eight must concur to find an indictment. A grand jury shall be drawn and summoned only at the discretion and order of the district judge.

Mont. Const. art II, § 20.

¶40    CI-116 provides a victim with the right "to receive reasonable, accurate, and timely notice of and to be present at all proceedings involving the criminal conduct, plea, sentencing, adjudication, disposition, release, or escape of the defendant or youth accused of delinquency and any proceeding implicating the rights of the victim." CI-116(1)(g). The initiative further grants victims the right "to be heard in any proceeding involving the release, plea, sentencing, disposition, adjudication, or parole of the defendant or youth accused of delinquency and any proceeding implicating the rights of the victim." CI-116(1)(i).

¶41    CI-116 thus requires courts give the victim notice of, allow the victim to be present at, and give the victim the opportunity to be heard at various hearings. These rights given to the victim add steps to the procedures a court is constitutionally required to take under Article II, Section 20, in initiating proceedings against a defendant and

26

drawing a grand jury. We conclude Article II, Section 20, of Montana's Constitution is substantively changed by CI-116(1)(g) and (i) and that the preexisting constitutional provision related to initiation of criminal proceedings is not closely related to crime victims' rights.

> E. *CI-116(1)(e) and (f) Affect Montana Constitution Article II, Section 24's Rights of the Accused.*

¶42 Article II, Section 24, of Montana's Constitution provides rights of the accused:

> In all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel; to demand the nature and cause of the accusation; to meet the witnesses against him face to face; to have process to compel the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed, subject to the right of the state to have a change of venue for any of the causes for which the defendant may obtain the same.

Mont. Const. art. II, § 24. As a "corollary to [Article II, Section 24's] fundamental right to defend," a defendant has "the right to conduct investigations and otherwise prepare a defense to the charges." *State v. Couture*, 2010 MT 201, ¶ 77, 357 Mont. 398, 240 P.3d 987.

¶43 CI-116 provides a victim with the right "to prevent the disclosure of information that could be used to locate or harass the victim or that contains confidential or privileged information about the victim." CI-116(1)(e). The initiative further provides a victim with the right "to privacy, including the right to refuse an interview, deposition, or other discovery request and to set reasonable conditions on the conduct of any interaction to which the victim consents." CI-116(1)(f).

27

¶44 CI-116 changes the accused's constitutional rights enumerated in Article II, Section 24. CI-116(1)(e) changes a defendant's right to discover any information he or she may be entitled to under Article II, Section 24, that "could be used to locate or harass the victim or that contains confidential or privileged information about the victim." CI-116(1)(f) also changes a defendant's right to discover information he or she may be entitled to under Article II, Section 24, by giving victims and those close to the victim as defined in CI-116(4)(b)(i) the right to "refuse an interview, deposition, or other discovery request." We conclude Montana Constitution, Article II, Section 24, is substantively changed by CI-116(1)(e) and (f). Further, sections (1)(e) and (f) are not closely related to our preexisting constitutional provision establishing basic constitutional rights of the accused, including the right to discover information, meet accusers, and prepare a defense.

*F. CI-116(1)(f) and (4)(b) Affect Montana Constitution Article II, Section 9's Right to Know and Section 10's Right of Privacy.*

¶45 Article II, Section 9, of Montana's Constitution provides the public's right to know:

> No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

Mont. Const. art. II, § 9.

28

¶46　Article II, Section 10, of Montana's Constitution provides for an individual's right of privacy:

> The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Mont. Const. art II, § 10. The public's right to know, Article II, Section 9, is balanced against the individual's right of privacy, Article II, Section 10. Montana Constitutional Convention, Committee Proposals, February 23, 1972, p. 631. Consistent with this interpretation by the Delegates, we have likewise found the two constitutional provisions are evaluated using a carefully designed, fact-intensive, balancing test. *See, e.g., Billings Gazette v. Billings*, 2013 MT 334, ¶¶ 14-16, 372 Mont. 409, 313 P.3d 129; *Missoula Cnty. Pub. Sch. v. Bitterroot Star*, 2015 MT 95, ¶ 11, 378 Mont. 451, 345 P.3d 1035. The right of privacy is an individual right and therefore cannot be invoked by all legally defined "persons," such as corporations or other groups. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1680; *Great Falls Tribune v. Mont. PSC*, 2003 MT 359, ¶ 33, 319 Mont. 38, 82 P.3d 876. Thus, the right to know, Article II, Section 9, is limited only by a natural person's right of privacy, and may not be limited by the privacy interests of corporations or groups. *Great Falls Tribune*, ¶ 37.

¶47　CI-116(1)(f) provides a crime victim with the right "to privacy, including the right to refuse an interview, deposition, or other discovery request and to set reasonable conditions on the conduct of any interaction to which the victim consents." Thus, CI-116 creates an entirely new privacy interest for victims, extended family members, and others with "similar relationships."

¶48 CI-116 affects Article II, Section 10's right of privacy and the balancing test between the right of privacy and the right to know. Aside from providing a new constitutional right to a particular class of persons—crime victims—which is a change in itself to the Constitution, CI-116 affects the balancing test employed between two preexisting constitutional provisions, the right of privacy and the right to know. Further, CI-116 gives the right of privacy to extended family members and others with similar relationships to the victim. Finally, CI-116(4)(b) specifically defines a victim as a "person" who suffers direct or threatened harm. In contrast, the term "person," as recognized by the Delegates, includes corporations and other non-human entities. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1680. Accordingly, "persons" entitled to a right to privacy under CI-116 would be different than under the constitutional provisions of Article II, Section 9, the public's right to know, and Section 10, an individual's right of privacy. We conclude Montana Constitution Article II, Sections 9 and 10, are substantively changed by CI-116(1)(f) and (4)(b) and that the people should have been afforded the right to vote on each amendment separately.

¶49 To summarize, CI-116 adds a new Section 36 to Article II of Montana's Constitution, substantively changing the Constitution by enumerating rights for victims. The preexisting constitutional provisions that are substantively changed by CI-116 include Article VII, Section 2(3)'s grant of power to the Supreme Court to govern attorney conduct; Article II, Section 21's right to bail; Article II, Section 20's criminal

30

procedure rules; Article II, Section 24's rights of the accused; Article II, Section 9's right to know; and Article II, Section 10's right of privacy.

¶50     Some of these provisions are related in the broad sense that they are implicated during a criminal prosecution. For example, Article II, Section 21's right to bail, Article II, Section 20's criminal procedure rules, and Article II, Section 24's rights of the accused all seek to protect an accused's fundamental rights during a criminal proceeding. However, a broad relationship between various provisions or a broad single subject does not satisfy the narrower interpretation of the separate-vote requirement we adopted in *Marshall* because voters did not have the opportunity to convey their opinions as to each constitutional provision changed by CI-116. For instance, voters should have had the option to independently decide if they wished to change the accused's right to bail by adding CI-116(1)(g) and/or (i); if they wished to change criminal procedure rules by adding CI-116(1)(g) and/or (i); if they wished to change rights of the accused by adding CI-116(1)(e) and/or (f); and if they wished to change the right to know and the right of privacy by adding CI-116(1)(f) and/or (4)(b). Further, not all of the affected provisions share even the broad connection of relating to a criminal prosecution or victim's rights. For example, attorney conduct, Article VII, Section 2(3), is not closely related to the right of privacy, Article II, Section 10, and neither of those provisions is closely related to the accused's right to bail, Article II, Section 21. Each of these amendments should have been presented to the electorate individually. Separate votes on each change would have protected the integrity of the vote and ensured that voters had complete control over each amendment made to the Montana Constitution.

31

¶51    CI-116 violates the separate-vote requirement and for that reason is void in its entirety. The Montana Constitution may only be amended pursuant to Article XIV. A constitutional amendment is invalid unless it is formed and adopted in a manner consistent with Article XIV. *Marshall*, ¶ 26 (citing *Waltermire*, 227 Mont. at 90-91, 738 P.2d at 1258). Moreover, a constitutional amendment submitted to the electorate in violation of the separate-vote requirement is void in its entirety because the constitutional "defect lies in the *submission* of [the proposed amendment] to the voters of Montana with more than one constitutional amendment." *Marshall*, ¶ 25 (emphasis in original).

¶52    CI-116 impliedly changed Montana's Constitution in numerous ways and we deem those changes to be both substantive and not closely related. When voters were required to vote "yes" or "no" for CI-116 in its entirety, they were forced to vote for or against multiple, not closely related, changes to the Montana Constitution with one vote. Voters had no way to express their opinions as to each proposed constitutional change. The way in which CI-116 was *submitted* to the electorate violated the separate-vote requirement of Article XIV, Section 11. Therefore, we declare CI-116 void in its entirety. We void the enactment of CI-116, enjoin its implementation and enforcement, and decertify the election results with respect to CI-116.

¶53    We reiterate that our decision is not based on the merits of the constitutional changes proposed by CI-116. Montana Constitution, Article XIV, Section 9, clearly grants the people initiative power to popularly amend the Constitution as they deem necessary, even if an amendment affects other portions of the Constitution. However, the procedure by which the Montana Constitution is amended must comply with existing

32

constitutional requirements. Article XIV, Section 11, is specifically designed to ensure voters have complete control over each and every constitutional change. Our decision today is based solely on our conclusion that CI-116 contains more than one constitutional amendment, each of which required a separate vote under Article XIV, Section 11.

## CONCLUSION

¶54 We hold Montana Constitution, Article V, Section 11(3)'s single-subject requirement does not apply to constitutional amendments. Therefore, we do not address MACo's argument that CI-116 violates Article V, Section 11(3). We expand upon our analysis of Montana Constitution, Article XIV, Section 11's separate-vote requirement and hold a proposed constitutional amendment violates the separate-vote requirement if it substantively changes two or more parts of the Constitution that are not closely related. Applying that analysis to CI-116, we hold CI-116 violates the separate-vote requirement and is therefore void in its entirety.

DATED this 1st day of November, 2017.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT
/S/ DIRK M. SANDEFUR

33

Justice Jim Rice, dissenting.

¶55   I believe the Court has adopted a deeply flawed test for application of the submission requirement of Article XIV, Section 11, of the Montana Constitution, which is not rooted in the text of the Constitution.   The effect of this decision may be to significantly undermine, if not eliminate, the right of Montanans to amend the Constitution by initiative.   This is not merely my opinion, but the experience of other courts.   Respectfully, I believe the Court has failed to "apply the separate-vote requirement in a manner that does not encumber the right of the people to amend the Constitution."  Opinion, ¶ 25.

¶56   Before discussing these concerns, I begin with the threshold concern that the Court has, in my view, violated justiciability principles by exercising original jurisdiction of this constitutional challenge.   The judicial power of Montana's courts is limited to "justiciable controversies."  *Reichert v. State*, 2012 MT 111, ¶ 53, 365 Mont. 92, 278 P.3d 455.   This constitutional limitation, deriving from Article VII, Section 4(1) of the Montana Constitution, "embodies the same limitations as are imposed on federal courts by the 'case or controversy' language of Article III" of the United States Constitution. *Mont. Immigrant Justice Alliance v. Bullock*, 2016 MT 104, ¶ 18, 383 Mont. 318, 371 P.3d 430 (citing *Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd.*, 2010 MT 26, ¶ 6, 355 Mont. 142, 226 P.3d 567).   Among the central components of justiciability is the doctrine of ripeness, which is concerned with whether the case presents an "actual, present" controversy.   *Reichert*, ¶ 54 (citing *Mont. Power Co. v. Mont. Pub. Serv.*

34

*Commn.*, 2001 MT 102, ¶ 32, 305 Mont. 260, 26 P.3d 91). The "prudential component" of the ripeness doctrine includes a fitness inquiry. *Reichert*, ¶ 56. "The principal consideration under the fitness inquiry is whether there is a factually adequate record upon which to base effective review." *Reichert*, ¶ 56 (citing *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 20, 333 Mont. 331, 142 P.3d 864). "The more the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa." *Reichert*, ¶ 56 (citing *Havre Daily News*, ¶ 20).

¶57     Similarly, the doctrine of judicial restraint cautions against the premature exercise of judicial authority. "Neither federal nor state Constitution has granted such power" to decide "abstract differences of opinion," but rather cases and controversies must be "real controversies." *Hardy v. Krutzfeldt*, 206 Mont. 521, 526, 672 P.2d 274, 276 (1983) (citing *Chovanak v. Matthews*, 120 Mont. 520, 525-26, 188 P.2d 582, 584 (1948)). "We have followed this same principle of judicial restraint" under our new Constitution, as under the former Constitution. *Roosevelt v. Mont. Dep't of Revenue*, 1999 MT 30, ¶ 48, 293 Mont. 240, 975 P.2d 295 (citing *Olson v. Dep't of Revenue*, 223 Mont. 464, 469-70, 726 P.2d 1162, 1166 (1986)). Especially when a "constitutional violation is claimed to have occurred," the plaintiff must allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens presentation of issues. . . ." *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7 L. Ed. 2d 663, 678 (1962). We have explained that:

> This Court . . . has no jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered: one, *never to anticipate a question of constitutional law in advance of the necessity of deciding it*; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.

*Roosevelt*, ¶ 49 (citing *United States v. Raines*, 362 U.S. 17, 21-22, 80 S. Ct. 519, 522-23, 4 L. Ed. 2d 524, 529-30 (1960) (emphasis added).

¶58 Beyond fitness and judicial restraint principles, this Court is to exercise original jurisdiction over a declaratory judgment matter only when constitutional issues of statewide importance are involved, urgency and emergency factors exist making the normal appeal process inadequate, and "the case involves *purely legal questions* of statutory and constitutional construction." *Hernandez v. Bd. of Cnty. Comm'rs*, 2008 MT 251, ¶ 9, 345 Mont. 1, 189 P.3d 638 (*citing Montanans for the Coal Trust v. State*, 2000 MT 13, ¶ 27, 298 Mont. 69, 996 P.2d 856) (emphasis added); *see also* M. R. Civ. P. 14(4); Mont. Const. art. VII, §§ 1-2.

¶59 Consequently, the requisite questions are 1) whether there is concrete adverseness and not an "abstract difference of opinion," 2) whether we are faced with purely legal questions of constitutional construction, and 3) whether there is a factually adequate record for effective review. However, the task of answering these questions in this case has been complicated by the Court's adoption, discussed below, of a complicated constitutional test requiring multiple determinations to be made for its application. While the issue as framed by the Court sounds in procedure—whether there was error "in the

submission of [CI-116] to the voters of Montana," Opinion, ¶ 51,—in reality, the test requires the Court to analyze the substantive content and effect of the initiative, which, in turn, makes a factual record even more critical.

¶60 Here, as the Court notes, CI-116 has not yet been implemented. With no information about its implementation, Petitioners have theorized about its application to allege their injury. *See* Petitioners' briefing (petitioner MACo members will be required to "seek tax increases, etc." and "to hire victim-support staff and additional attorneys;" petitioner county attorney will be injured "via raised taxes or fees, or fewer services;" petitioner lawyer's "ability to serve her [victim] clients will be injured by diminished funding for victim-services"). Petitioner Association of Criminal Defense Attorneys alleges simply that the rights of its members' clients to "traditional" due process protections "will be diminished." Petitioner ACLU of Montana Foundation alleges in like fashion that "some [of its members] will in the future be accused of a crime and be injured by application of Section 36." However, no factfinding whatsoever has occurred to confirm any of these assertions, and they are, at this stage, merely "abstract differences of opinion" regarding the impact of the implementation of CI-116, dependent upon how a court interprets and applies its provisions to particular circumstances. *Hardy*, 206 Mont. at 526, 672 P.2d at 276.

¶61 The Court states that "the question of whether CI-116 violates the Montana Constitution involves purely legal questions of constitutional interpretation," Opinion, ¶ 2, but Petitioners' untethered allegations and absence of a record force the Court to make factual assumptions, such as its vague findings that CI-116 "changes a prosecutor's

duties" and will "add steps" to criminal proceedings. Opinion, ¶¶ 36, 41. This problem is notable within the Court's analysis of the right to privacy in Issue 1f. Lacking a factual record of an actual privacy claim by a victim, the Court makes the assumption that any such claim would "substantively change[]" Article II, Sections 9 and 10, and fails to recognize that the privacy interest created by CI-116 is textually much different. Opinion, ¶ 48. Article II, Section 10 provides a broad-based privacy right to every individual, potentially applicable to any number of circumstances, as "essential to the well-being of a free society." In contrast, the text of CI-116 recognizes a more limited right of privacy applicable to crime victims during a criminal proceeding. The right granted under CI-116 may well lead to claims that are narrower in scope and warrant a narrower remedy, which may be possible to harmonize with the Article II privacy right, as is our duty. Indeed, other jurisdictions have determined that victim rights of privacy do not create an absolute right, but rather a flexible right allowing courts to weigh the circumstances of each case. *See e.g. State v. Gonzalez*, 912 P.2d 297, 300 (N.M. Ct. App. 1996) (rejecting argument that victims' rights amendment created an "absolute" privilege against inspection of victim's medical records by the trial court or subsequent disclosure to other parties); *State of Maryland v. WBAL-TV*, 975 A.2d 909, 922-23 (Md. Ct. App. 2009) (victims' right amendment "does not . . . provide victims with an absolute right to veto a request to access and copy court records").

¶62 Similarly, the problem is notable in the Court's application of a prosecutor's duties in issue 1(b). The Court acknowledges that the text of CI-116(1)(j) gives a victim only a right to "confer with the prosecuting attorney," a limited right that is already common

38

practice. Opinion, ¶ 35. Lacking a factual record, the Court must assume how the provision will be applied, and concludes that a victim's right to confer with a prosecutor will "change[] the way a prosecutor must handle a criminal case." Opinion, ¶ 36. The court first reasons that a prosecutor "must obey the Montana Rules of Professional Conduct" which prohibit "prosecuting a charge that the prosecutor knows is not supported by probable cause." Opinion, ¶ 34. Then, the Court assumes that prosecutors will interpret a victim's right to "confer with the prosecuting attorney" as tantamount to giving the victim the power to force prosecutions, in turn forcing the prosecutor to pursue a case that is "not supported by probable cause[,]" and will thus affect our ability to make rules governing attorney conduct. Opinion, ¶ 34-36. These assumptions stray from the limited right for a victim to meet with a prosecutor, which may be possible to harmonize with existing constitutional provisions. At this point, we do not know how the new constitutional interests will be raised and what remedy will be claimed. The Court is basing its constitutional ruling upon its deduction about how the provisions will be interpreted and applied.

¶63     As we stated earlier in this case, "we use the same rules of construction to interpret constitutional initiatives that we use to interpret statutes." *Mont. Cnty. Attys. Ass'n v. State*, 387 Mont. 534, *2 (citation omitted). "Where there are several statutory provisions or particulars, the Court construes them, if possible, to give effect to all. Section 1-2-101, MCA." *Olson v. Daughenbaugh*, 2001 MT 284, ¶ 16, 307 Mont. 371, 38 P.3d 154. Likewise, we are to interpret provisions "in a manner that gives effect to the legislature's intent if possible." *Weidow v. Uninsured Employers' Fund*, 2010 MT 292, ¶ 22, 359

Mont. 77, 246 P.3d 704. However, we cannot now know if our interpretational duty to harmonize these constitutional provisions is possible to fulfill. Without a specific claim and a factual record, it is impossible to properly determine whether a constitutional conflict exists that cannot be reconciled.

¶64 This is likewise true of the other constitutional conflicts that the Court perceives in CI-116. Without a factual record, the Court cannot determine whether it is possible to balance competing constitutional interests, a duty we are often compelled to perform. *See Galt v. State*, 225 Mont. 142, 148, 731 P.2d 912, 916 (1987) (balancing the constitutional interests of private landowners under Article IX, Section 7 and Article II, Section 3 with the public's property interest in water under Article IX, Section 3); *Krakauer v. State*, 2016 MT 230, ¶ 36, 384 Mont. 527, 381 P.3d 524 (competing constitutional interests should be addressed in a case-by-case basis and according to the facts of each case). How particular constitutional rights will be weighed and balanced with other such rights is a matter that can only be decided in the factual context of an actual, concrete legal dispute.

¶65 Because "additional facts [would] aid the court in its inquiry," *Reichert*, ¶ 56, and decisively so, I would conclude that the petition fails to present a ripe issue, that we are not faced with purely legal questions of constitutional interpretation, and that the factual record is inadequate for effective review. While the Court offers that "normal litigation and appeal processes are inadequate because implementation of CI-116 is imminent," Opinion, ¶ 2, this provides no basis under our precedent to exercise original jurisdiction. All enacted laws become imminently enforceable.

40

¶66 While I could stop at this point, my deep concerns about the Court's new test for application of the separate-vote requirement of Article XIV, Section 11, lead me to discuss the merits of the Court's constitutional analysis. In *Marshall v. State*, 1999 MT 33, 293 Mont. 274, 975 P.2d 325, this Court invalidated CI-75 for violating the separate vote requirement of Article XIV, Section 11. We first found that "CI-75 specifically amends three parts of Montana's Constitution." *Marshall*, ¶ 24. The Court determined that the text of CI-75 expressly amended Article VIII, Article II, Section 18, and Article VI, Section 10, of the Constitution. *Marshall*, ¶ 24. Then, the Court concluded "[b]ecause CI-75 expressly amends three parts of Montana's Constitution but does not allow a separate vote for each amendment, we hold that CI-75 violates Article XIV, Section 11, of Montana's Constitution." *Marshall*, ¶ 24.

¶67 The Court in *Marshall* was guided by the Oregon Supreme Court's decision in *Armatta v. Kitzhaber*, 959 P.2d 49 (Or. 1998). Although acknowledging that the Montana Constitution differs from the Oregon Constitution, Opinion, ¶ 22, the Court today more fully incorporates principles from *Armatta*, which, in my opinion, do not correspond to the Montana Constitution. The Court also adds additional requirements of its own to formulate a new test. The Court holds:

> [T]he proper inquiry is whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and not closely related. Moreover, if a proposed constitutional amendment adds new language to the constitution, that proposition is at least one change in and of itself. Then 'if a measure has the effect of modifying an existing constitutional provision, it proposes at least one additional change to the constitution, whether that effect is explicit or implicit.'

Opinion, ¶ 28, (citations omitted).

¶68    Then, the Court adopts further holdings from the *Armatta* line of authority to instruct its "closely related" component:

> First, we examine the relationship among the constitutional provisions that the measure affects, both explicitly and implicitly. If the affected provisions of the existing constitution themselves are not related, then it is likely that changes to those provisions will offend the separate-vote requirement. . .
>
> .   .   .
>
> Next, we must consider the constitutional changes themselves. That is, assuming that the constitutional provisions affected by the measure are closely related, we must determine whether the changes made to those related constitutional provisions are closely related. If they are closely related, the measure under consideration survives scrutiny under [the separate-vote requirement]. If they are not, it does not.

Opinion, ¶ 29.

¶69    Thus, under the Court's new test, if a constitutional initiative adds new language to the constitution, "that proposition is at least one change in and of itself." Opinion, ¶ 28. Then, if the initiative "has the effect of modifying" an existing constitutional provision in a way that is deemed "unrelated" to the new text, whether such modification is express or implied, then such an "effect" must also be counted as "one additional change to the constitution," requiring a separate vote. Opinion, ¶ 28. Applying the new test here, the Court concludes that CI-116 is invalid in seven different ways, reasoning that the initiative "affects" seven different existing provisions of the Montana Constitution, each of which required a separate vote, in addition to the vote taken on the text of CI-116 itself, for a total of eight votes. Opinion, ¶¶ 31-49.

¶70    This new formula, whereby a textual "proposition" is counted as "one change in and of itself," while the measure's "effect" upon an existing constitutional provision is

42

counted as a second change, Opinion, ¶ 28, is inconsistent with the language of Article XIV, Section 11, which is premised upon the concept of "amendments," not "propositions" and "effects." The distinction is illustrated by the Court's analysis of the right to privacy.

¶71 CI-116 provides that crime victims have the right "to privacy, including the right to refuse an interview, deposition or other discovery request and to set reasonable conditions on the conduct of any interaction to which the victim consents." CI-116(1)(f). Applying its new test to this clause, the Court first reasons that CI-116 "provid[es] a new constitutional right to . . . crime victims" which is a "change in itself[.]" Opinion, ¶ 48. Then the Court reasons that this new clause also "substantively change[s]" Article II, Section 9, the public's right to know, and Section 10, an individual's right to privacy, which requires a separate vote because of how it "affect[s]" the two constitutional provisions, thus concluding that the clause must receive a separate vote for its adoption. Opinion, ¶ 48. However, what has been lost in the application of the test's components is that the two concepts identified by the Court are two sides of the same amendment coin: one side is the new text, while the other side is the effect of the new text. Article XIV, Section 11, does not require separate votes for text and effect, but for wholly separate *amendments*, and we should analyze the issue in that way—as we did in *Marshall*.

¶72 To be clear, I agree with the Court that a constitutional initiative could have the effect of amending one or more articles of the Constitution even though the initiative's text does not expressly identify or add new language to the amended articles. Thus, I concur with the Court's assessment that in *Marshall*, n.2, we left open the possibility that

43

such an initiative could run afoul of Article XIV, Section 11. Opinion, ¶ 24.[1] My disagreement lies in the test adopted by the Court for identifying these separate amendments. As recognized by other courts, the Court's test is problematic because it will lead to the invalidation of challenged constitutional initiatives that do not actually effectuate multiple amendments, severely undermining citizen rights.

¶73    The *Armatta* approach—that is, adoption of "an exacting functional relationship test" for application of a constitutional separate-vote requirement, as the Court does here by way of its "closely-related" requirement, Opinion, ¶¶ 28-29—has been recognized as the "minority rule" among the states, and was once thought dormant. *Californians for an Open Primary v. McPherson*, 134 P.3d 299, 322 (Cal. 2006) (explaining that the *Armatta* approach was "an essentially dormant minority position until the Supreme Court of Oregon—without citing any of them or acknowledging the majority rule cases discussed above—revived this strict interpretation of the separate-vote provision in 1998."). While courts must faithfully interpret their own unique constitutions, the majority and minority positions on this issue have been acknowledged in case law and scholarship, wherein it is recognized that "it is clear" the full *Armatta* approach "is indeed a demanding one" that leads to the predictable conclusion that "most proposed constitutional amendments will fail" under its application. *McPherson*, 134 P.3d at 322-23 ("Indeed, in the few other jurisdictions that recently have embraced (explicitly or implicitly) *Armatta*'s interpretation of the separate-vote provision under their own constitutions, the results

---

[1] I also concur with the Court's statement that the single-subject requirement does not apply to constitutional amendments. Opinion, ¶ 20.

have, with one exception, been consistent with the recent Oregon experience" of striking down challenged initiatives.). Commentary has noted the difficulty in drafting an initiative that can survive application of the *Armatta* test. *See* Phillip Bentley, *Armatta v. Kitzhaber: A New Test Safeguarding the Oregon Constitution from Amendment by Initiative*, 78 Or. L. Rev. 1139, 1154-56 (1999).

¶74 This precipitous invalidation of initiatives likely will occur under the Court's analysis here. I note again the Court's analysis of CI-116's right to privacy provision. If CI-116, *in its entirety*, would have provided only that victims have a right "to privacy, including the right to refuse an interview, deposition, or other discovery request and to set reasonable conditions on the conduct of any interaction to which the victim consents," *see* CI-116(1)(f), and said nothing else, it would nonetheless still violate the separate-vote requirement under the Court's test, and be invalid. This is because it adds a new section to the Constitution—requiring one vote—and also constitutes an "unrelated" implied change to the existing privacy provision—requiring a second vote. *See* Opinion, ¶¶ 31-49. Few initiatives will survive the microscobic judicial review created herein.[2]

---

[2] Similarly, if CI-116, in its entirety, would have provided only that "crime victims have the right to due process and be treated with fairness and respect for the victim's dignity," see CI-116(1)(a), and said nothing else, it would nonetheless still violate the separate-vote requirement under the Court's test, and be invalid. This is because it adds a new section to the Constitution—requiring one vote, and also constitutes an unrelated implicit change to the existing due process provision—requiring a second vote. *See* Opinion, ¶ 33.

¶75     Instead, we should use the test that is consistent with the language of Article XIV, Section 11, our constitutional history,[3] and our case law.  In *Marshall*, while taking "guidance" from *Armatta*, we did not adopt that holding wholesale.  Rather, we employed an analysis founded upon our own Constitution, which is premised on whole "amendments."  We made a straight-forward determination that the text of CI-75 amended the Constitution in three ways—without regard to the numerous concepts employed here by the Court.  *Marshall*, ¶ 24.  The same approach can be used for initiatives that amend the Constitution without the use of explicit language—as the Court suggested in footnote #2.  The question is, does the initiative substantively constitute more than one amendment?  Such an approach would not invalidate an initiative merely

_____

[3]   The Court states that the 1972 Constitution changed the separate-vote requirement because the new constitution allowed amendment by initiative. Opinion, ¶ 19 (concluding "the 1972 Constitution's amendment by initiative interjected a new element into the separate-vote requirement. . . ."). However, nothing in the text or history of the separate-vote requirement would support this contention. Rather, the 1972 drafters unanimously adopted the same separate amendment rule from the prior constitution, Mont. Const. Conv. Proc. Vol. I, 354 (1972) (hereafter Committee Report), and made only stylistic changes to the rule.  *See* Mont. Const. Conv. Proc. Vol. IV, 1195 (1972). The Style and Drafting Committee simplified the language to its present form: "If more than one amendment is submitted in the same election, each shall be so prepared and distinguished that it can be voted upon separately." The language from the 1889 separate-amendment rule read: "Should more amendments than one be submitted at the same election, they shall be so prepared and distinguished by numbers or otherwise that each can be voted upon separately." Mont. Const. art XIX, § 9 (1889).
    The 1969 Legislature appointed a Constitutional Revision Committee, which contemplated how a new constitution might be amended by initiative. The basic purpose of the Committee was to make "a fundamental yet flexible document" for constitutional amendments.  Committee Report, at 354.   The Committee recognized the importance of constitutional initiatives, recognizing a "further guarantee that the people will retain a firm hold on the power of constituting government."  Committee Report, at 358.  The Committee stated that constitutional amendments were "an inherent right in a body politic whose Constitution is to be the embodiment of the will of the people."  Committee Report, at 363.  The purpose of allowing popular initiatives was to avoid "cumbersome procedural detail," which had been a "burden to often-popular Constitutional change," and to preclude the Supreme Court from voiding proposed amendments because of a "slight procedural irregularity." Mont. Const. Conv. Proc. Vol. I, 362 (1972).

because it contained text that changed or revised more than one article of the Constitution, as long as those revisions were part of one complete, substantive amendment. Further, this straight-forward, constitutionally-based approach would avoid the flawed formulaic approach of assessing the text and the effect separately.

¶76 Most importantly, so holding would affirm the promise of Article II, Section 2, of the Montana Constitution, whether the courts think it good policy or not:

> *The people have the exclusive right of governing themselves as a free, sovereign, and independent state. They may alter or abolish the constitution and form of government whenever they deem it necessary.*

¶77 I dissent.


/S/ JIM RICE


Justice Beth Baker joins in the dissenting Opinion of Justice Rice.


/S/ BETH BAKER

## Appendix A

## Constitutional Initiative 116

(1) To preserve and protect a crime victim's right to justice, to ensure a crime victim has a meaningful role in criminal and juvenile justice systems, and to ensure that a crime victim's rights and interests are respected and protected by law in a manner no less vigorous than the protections afforded to a criminal defendant and a delinquent youth, a crime victim has the following rights, beginning at the time of victimization:

(a) to due process and to be treated with fairness and respect for the victim's dignity;

(b) to be free from intimidation, harassment, and abuse;

(c) to be reasonably protected from the accused and any person acting on the accused's behalf;

(d) to have the victim's safety and welfare considered when setting bail and making release decisions;

(e) to prevent the disclosure of information that could be used to locate or harass the victim or that contains confidential or privileged information about the victim;

(f) to privacy, including the right to refuse an interview, deposition, or other discovery request and to set reasonable conditions on the conduct of any interaction to which the victim consents;

(g) to receive reasonable, accurate, and timely notice of and to be present at all proceedings involving the criminal conduct, plea, sentencing, adjudication, disposition, release, or escape of the defendant or youth accused of delinquency and any proceeding implicating the rights of the victim;

(h) to be promptly notified of any release or escape of the accused;

(i) to be heard in any proceeding involving the release, plea, sentencing, disposition, adjudication, or parole of the defendant or youth accused of delinquency and any proceeding implicating the rights of the victim;

(j) to confer with the prosecuting attorney;

(k) to provide information regarding the impact the offender's conduct had on the victim for inclusion in the presentence or predisposition investigation report and to have the information considered in any sentencing or disposition recommendations submitted to the court;

(l) to receive a copy of any presentence report and any other report or record relevant to the exercise of a right of the victim, except for those portions made confidential by law;

1

(m) to the prompt return of the victim's property when no longer needed as evidence in the case;

(n) to full and timely restitution. All money and property collected from a person who has been ordered to make restitution must be applied first to the restitution owed to the victim before paying any amounts owed to the government.

(o) to proceedings free from unreasonable delay and to a prompt and final conclusion of the case and any related postjudgment proceedings;

(p) to be informed of the conviction, sentence, adjudication, place and time of incarceration, or other disposition of the offender, including any scheduled release date, actual release date, or escape;

(q) to be informed of clemency and expungement procedures; to provide information to the Governor, the court, any clemency board, or any other authority and to have that information considered before a decision is made; and to be notified of any decision before the release of the offender; and

(r) to be informed of the above rights and to be informed that the victim may seek the advice and assistance of an attorney with respect to the above rights. This information must be made available to the general public and provided to all crime victims on what is referred to as a Marsy's card.

(2) A victim, the victim's attorney, the victim's legal representative, or the prosecuting attorney at the request of the victim may assert and seek enforcement of the rights enumerated in this section and any other right afforded to the victim by law in any trial or appellate court or any other authority with jurisdiction over the case as a matter of right. The court or other authority shall act promptly on the request, affording a remedy by due course of law for the violation of any right. The reasons for any decision regarding disposition of a victim's right must be clearly stated on the record.

(3) This section may not be construed to deny or disparage other rights possessed by victims. This section applies to criminal and youth court proceedings, is self-executing, and requires no further action by the Legislature.

(4) As used in this section, the following definitions apply:

(a) "Crime" means an act defined as a felony, misdemeanor, or delinquency under state law.

(b) "Victim" means a person who suffers direct or threated physical, psychological, or financial harm as a result of the commission or attempted commission of a crime.

(i) The term includes:

> (A) a spouse, parent, grandparent, child, sibling, grandchild, or guardian of the victim;
> (B) a person with a relationship to the victim that is substantially similar to a relationship described in subsection (4)(b)(i)(A); and
> (C) a representative of a victim who is a minor or who is deceased, incompetent or incapacitated.
>
> (ii) The term does not include the accused or a person who the court believes would not act in the best interests of a minor or of a victim who is deceased, incompetent or incapacitated.

Mont. Const. art II, § 36 (2017), https://perma.cc/VQ76-WRAJ.

3