FILED

03/18/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 24-0052

OP 24-0052

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 54

MONTANANS SECURING REPRODUCTIVE
RIGHTS and SAMUEL DICKMAN, M.D.,

       Petitioners,

   v.

AUSTIN MILES KNUDSEN, in his official
Capacity as MONTANA ATTORNEY GENERAL;
and CHRISTI JACOBSEN, in her official Capacity
as MONTANA SECRETARY OF STATE,

       Respondents.

ORIGINAL PROCEEDING: Constitutional Initiative 14

COUNSEL OF RECORD:

       For Petitioners:

          Raph Graybill, Graybill Law Firm, P.C., Great Falls, Montana

       For Respondents:

          Austin Knudsen, Montana Attorney General, Michael Russell, Michael
          Noonan, Assistant Attorneys General, Helena, Montana

          Emily Jones, Special Assistant Attorney General, Jones Law Firm, PLLC,
          Billings, Montana

       For Amici American Center for Law & Justice, Susan B. Anthony Pro-Life
       America, and Montana Family Foundation:

          Derek J. Oestreicher, Montana Family Foundation, Laurel, Montana

                      Decided:  March 18, 2024

Filed:

                          _____
                                Clerk

Justice Ingrid Gustafson delivered the Opinion and Order of the Court.

¶1 Petitioners Montanans Securing Reproductive Rights and Samuel Dickman, M.D. ("MSRR"), seek declaratory judgment on original jurisdiction under M. R. App. P. 14(4). MSRR argues it is entitled to declaratory judgment that: (1) the Attorney General incorrectly determined that the subject ballot issue is legally insufficient; (2) the Attorney General had no authority to append a fiscal statement to the ballot issue under § 13-27-226(4), MCA; and (3) MSRR's ballot statements comply with §§ 13-27-212 and -213, MCA. At our invitation, the Attorney General has responded to the petition.

¶2 We consider the following issues:

1. *Did the Attorney General err in concluding that MSRR's proposed ballot issue is legally insufficient?*

2. *Did the Attorney General exceed his authority by appending a fiscal statement to MSRR's proposed ballot issue?*

3. *Do MSRR's ballot statements comply with §§ 13-27-212, and -213, MCA?*

¶3 On November 22, 2023, MSRR submitted the text of a proposed constitutional initiative and proposed ballot statements for the 2024 ballot to Secretary of State Christi Jacobsen. Jacobsen designated the submission as CI-14. MSRR submitted finalized initiative text and ballot statements to Jacobsen on December 6, 2023. Jacobsen then referred the matter to the Attorney General and to the Governor's Office of Budget and Program Planning (OBPP).

¶4 On December 15, 2023, OBPP determined that CI-14 would have $0 fiscal impact in the next biennium, and it could not determine fiscal impact beyond the biennium. On January 16, 2024, the Attorney General determined that CI-14 is legally insufficient

2

because it violates Article XIV, Section 11, of the Montana Constitution. He drafted a fiscal statement for CI-14 but declined to address MSRR's ballot statements. MSRR then petitioned this Court for declaratory relief on original jurisdiction on January 26, 2024.

¶5    *1. Did the Attorney General err in concluding that MSRR's proposed ballot issue is legally insufficient?*

¶6    Section 3-2-202(3)(a), MCA, provides this Court original jurisdiction to review the Attorney General's legal sufficiency determination. It is within the Attorney General's authority to determine whether a proposed ballot issue complies with the separate-vote provision of Article XIV, Section 11, of the Montana Constitution. *Monforton v. Knudsen*, 2023 MT 179, ¶ 11, 413 Mont. 367, 539 P.3d 1078. Thus, we consider whether the Attorney General correctly concluded that CI-14 violates Article XIV, Section 11, of the Montana Constitution, because it proposes multiple constitutional amendments.

¶7    We have addressed the requirements of Article XIV, Section 11, of the Montana Constitution:

> The proper inquiry is whether, if adopted, the proposal would make two or more changes to the Constitution that are substantive and not closely related. We have employed a definition of substantive as "an essential part or constituent or relating to what is essential." Then, numerous factors may be considered in determining whether the provisions of a proposed constitutional amendment are closely related, including: whether various provisions are facially related, whether all the matters addressed by the proposition concern a single section of the constitution, whether the voters or the legislature historically has treated the matters addressed as one subject, and whether the various provisions are qualitatively similar in their effect on either procedural or substantive law. In summary, if a proposal would effect two or more changes that are substantive and not closely related, the proposal violates the separate-vote requirement because it would prevent the voters from expressing their opinions as to each proposed change separately.

3

*Monforton*, ¶ 12.

¶8    CI-14 would amend Article II of the Montana Constitution by adding a new Section 36 that would provide as follows:

> Section 36.  Right to make decisions about pregnancy.  (1)  There is a right to make and carry out decisions about one's own pregnancy, including the right to abortion.  This right shall not be denied or burdened unless justified by a compelling government interest achieved by the least restrictive means.
>
> (2) The government may regulate the provision of abortion care after fetal viability provided that in no circumstance shall the government deny or burden access to an abortion that, in the good faith judgment of a treating health care professional, is medically indicated to protect the life or health of the pregnant patient.
>
> (3) The government shall not penalize, prosecute, or otherwise take adverse action against a person based on the person's actual, potential, perceived, or alleged pregnancy outcomes.  The government shall not penalize, prosecute, or otherwise take adverse action against a person for aiding or assisting another person in exercising their right to make and carry out decisions about their pregnancy with their voluntary consent.
>
> (4) For purposes of this section:
>
> > (a) A government interest is "compelling" only if it clearly and convincingly addresses a medically acknowledged, bona fide health risk to a pregnant patient and does not infringe on the patient's autonomous decision making.
> >
> > (b) "Fetal viability" means the point in pregnancy when, in the good faith judgment of a treating health care professional and based on the particular facts of the case, there is a significant likelihood of the fetus's sustained survival outside the uterus without the application of extraordinary medical measures.

¶9    On petition to this Court, MSRR argues each component of CI-14 is "facially related" to the right to make decisions about pregnancy and comprises a single constitutional amendment with closely related provisions.  It argues that it fulfills the

4

factors that this Court has held may demonstrate that the provisions of a proposed constitutional amendment are closely related.

¶10   MSRR maintains that Subsections 1 and 2 define the scope of the right and Subsection 3 secures the right against adverse action by the government.  MSRR asserts that the subsections of CI-14 are qualitatively similar in their effect on either procedural or substantive law because the subsections affect one topic in a single, comprehensive way.  Moreover, the voters and the Legislature have historically treated the matters addressed in CI-14 as one subject.  For example, House Bill 136, passed during the 2021 Montana Legislative Session, set parameters for the period during pregnancy in which an abortion may generally be performed, or may be performed if the pregnant person's health is at risk, and provided penalties against individuals who perform or attempt to perform an abortion in violation of those parameters.  *See Planned Parenthood of Mont. v. State*, 2022 MT 157, ¶ 10, 409 Mont. 378, 515 P.3d 301 (summarizing HB 136 as: banning abortions beginning at 20 weeks past the pregnant person's last menstrual period; prohibiting later-term abortions unless necessary to prevent a serious health risk to the pregnant person; and providing for civil and criminal damages for violations).  Finally, MSRR asserts that CI-14 plainly affects only one topic and does so in a single, comprehensive way, by establishing and outlining the right to make decisions about one's own pregnancy and securing that right from government interference.  Thus, MSRR maintains that CI-14 comports with the separate-vote requirement of Article XIV, Section 11, of the Montana Constitution.

¶11   In the Legal Sufficiency Review, the Attorney General asserted that CI-14 fails to comply with the separate-vote requirement in four ways: (1) CI-14 also amends Article II,

Section 10, of the Montana Constitution. (2) Subsections 1 and 2 represent independent political choices that require separate votes. (3) Subsection 3 encompasses policy choices divorced from Subsections 1 and 2. (4) Subsection 3 prohibits the State from enforcing valid health and safety regulations, which is a different choice than the expansion of reproductive rights. We consider each of those alleged insufficiencies in turn.

¶12 In its response to MSRR's petition, the Attorney General points out that we have held that a proposal violates Article XIV, Section 11, of the Montana Constitution, if it proposes an additional change to the Constitution, even if that effect is implicit. *Mont. Ass'n of Counties v. State*, 2017 MT 267, ¶ 28, 389 Mont. 183, 404 P.3d 733 ("MACo"). He argues that CI-14 implicitly changes Article II, Section 10, of the Montana Constitution, because Article II, Section 10, already protects a person's right to a pre-viability abortion. *Armstrong v. State*, 1999 MT 261, ¶ 75, 296 Mont. 361, 989 P.2d 364. The Attorney General first suggests that CI-14 might "remove" the right to abortion from Article II, Section 10, of the Montana Constitution.

¶13 *Armstrong* explains that the Montana Constitution, particularly within Article II, is "a compact of overlapping and redundant rights and guarantees" and the rights of procreative autonomy found within Article II, Section 10, of the Montana Constitution, also find protection in other Constitutional provisions. *Armstrong*, ¶ 71 (citations omitted). That the rights and protections guaranteed by one provision of the Constitution may also be found in other provisions is well-established. For example, we have long recognized that Article II, Section 11, of the Montana Constitution, which guarantees individuals the right to be free from unreasonable searches and seizures, is augmented by the express right

6

to privacy against government intrusion granted by Article II, Section 10, of the Montana Constitution. "The express right to privacy [guaranteed by Article II, Section 10] works in tandem with Article II, Section 11, to expand where people have reasonable expectations of privacy that are protected from unreasonable government intrusions." *State v. Thompson*, 2023 MT 194, ¶ 15, 413 Mont. 446, 537 P.3d 461. The Attorney General offers no authoritative support for his theory that creating an explicit constitutional right somehow removes protection for that right from all other constitutional provisions that may otherwise protect that right. We are unpersuaded by his argument that CI-14 would change Article II, Section 10, of the Montana Constitution, by "removing" the protection provided to the right to abortion from the right to privacy.

¶14    The Attorney General next argues that CI-14 would "create conflicts" with Article II, Section 10, of the Montana Constitution, because it differs from *Armstrong's* interpretation as to how the right to abortion is protected under the constitutional right to privacy. MSRR replies that CI-14 does not amend the right to privacy but would establish a distinct section in the Montana Constitution that "provides an independent textual source of the right to make decisions about pregnancy." MSRR asserts that "[u]nripe theories about the relationship between CI-14 and the *Armstrong* case are not the same as a separate vote problem," and this Court should not speculate as to how CI-14 and *Armstrong* might interact, or how CI-14 might affect pending litigation that is currently subject to analysis under *Armstrong*.

¶15    The Attorney General's arguments as to how he interprets CI-14 do not go to the question of whether "the proposal would make two or more changes to the Constitution

that are substantive and not closely related." *Monforton*, ¶ 12 (citation omitted). These arguments instead go to how CI-14, if adopted, might be interpreted in future litigation and to *Armstrong's* continued applicability on questions pertaining to the right to reproductive autonomy. Such questions go beyond the Attorney General's authority in making legal sufficiency determinations of ballot initiatives. *Monforton*, ¶ 6 (citing *Cottonwood Envtl. Law Ctr. v. Knudsen*, 2022 MT 49, ¶ 32, 408 Mont. 57, 505 P.3d 837 (McGrath, C.J., concurring) ("[T]he Attorney General lacks such power, and the Legislature equally lacks the power to confer it upon him. The Montana Constitution vests in the courts the exclusive power to construe and interpret legislative Acts, as well as provisions of the Constitution." (citation and internal quotation omitted)). The Attorney General cannot find CI-14 legally insufficient on this basis because these arguments do not go to the question of whether CI-14 violates Article XIV, Section 11, of the Montana Constitution.

¶16 The Attorney General further determined that CI-14 violates Article XIV, Section 11, of the Montana Constitution, because Subsections 1 and 2 represent independent political choices that require separate votes. The Attorney General maintains that voters' opinions as to when abortion should be permitted varies, and voters should be able to choose the time limits.

¶17 MSRR asserts that Article XIV, Section 9, of the Montana Constitution, empowers the initiative's sponsor to determine the "contours" of the proposed ballot initiative, and the Attorney General cannot block an initiative "simply because he would . . . subjectively prefer more discrete sub-choices." It argues that CI-14 presents voters with a binary choice about a single proposal, with subsections that "operate in unison to establish, outline, and

8

secure the right." It maintains that, read together, Subsections 1 and 2 define the scope of the right established: Pre-viability, the government cannot burden the right to abortion absent a compelling government interest. Post-viability, the government may regulate the provision of abortion care but it shall not deny or burden access to abortion if the abortion is medically indicated to protect the life or health of the pregnant patient.

¶18 The clear import of the separate-vote requirement of Article XIV, Section 11, of the Montana Constitution, is to allow voters to express their separate opinion as to each proposed constitutional amendment. *MACo*, ¶ 25. In *MACo*, we rejected the "narrowest interpretation of the separate-vote requirement" favored by some states that required that a proposed initiative consist only of "parts so interdependent that they constitute a whole and cannot be separated." *MACo*, ¶ 26. Instead, we inquire "whether, if adopted, the proposal would make two or more changes to the Constitution that are substantive and not closely related." *MACo*, ¶ 28.

¶19 In *Montanans for Election Reform Action Fund v. Knudsen*, 2023 MT 226, 414 Mont. 135, ___ P.3d ___ ("MER"), we rejected the Attorney General's argument that a ballot initiative to create an open primary system for specified offices violated the separate-vote requirement because the issue of the creation of an open primary system was separate from the question of which offices to include or exclude from this system. *MER*, ¶ 11. We determined that specifying the offices to which the open primary system would apply was not "logrolling" because we could not "envision how one could design a primary system without specifying the offices to which it would apply." *MER*, ¶ 12. By specifying the offices to which the proposed open primary system would apply, that ballot

9

initiative specified the scope of the proposed open primary system. Similarly in the present case, MSRR has proposed a constitutional amendment that would specify the scope of the right: CI-14 specifies the right it creates and the limitations thereto, which constitutes a single change to the Constitution.

¶20 The Attorney General also determined that CI-14 is legally insufficient because Subsection 3 would "inject[] significant uncertainty" into areas of the law and would preclude the State from enforcing valid health and safety regulations. The Attorney General further asserts that Subsection 3 violates the separate-vote requirement because it prohibits the government from taking adverse action against any person who aids or assists someone in exercising their right to make and carry out decisions about their pregnancy because voters could cast intelligible votes distinguishing among groups.

¶21 On petition, MSRR argues that the Attorney General does not establish that Subsection 3 violates the separate-vote requirement. MSRR contends that the Attorney General fails to explain how Subsection 3 would "make two or more changes to the Constitution that are substantive and not closely related." *Monforton*, ¶ 12; *MACo*, ¶ 28.

¶22 First, we note that the Attorney General offers no theory as to how Subsection 3 would substantively change any other constitutional provision. *MACo*, ¶ 31; *MER*, ¶ 18 (where the proposed ballot initiative does not implicate a separate provision of the Constitution, there is no separate amendment that would require a separate vote). The Attorney General's speculation as to how Subsection 3 might affect statutes and regulations does not provide a basis for him to determine that CI-14 is legally insufficient, as it exceeds his authority in making such determination. *Monforton*, ¶ 6.

10

¶23     As to the Attorney General's argument that Subsection 3 violates the separate-vote requirement because it would not allow voters to cast separate votes as to each group that might aid or assist someone in exercising their right to make and carry out decisions about their pregnancy, we rejected this argument in *MER*, in which the Attorney General contended that the proposed ballot initiative violated the separate-vote requirement because it did not allow the voters to vote separately on each and every elected office that could be subject to the proposed constitutional amendment.  *MER*, ¶¶ 11-12.  We must apply the separate-vote requirement in a manner that does not encumber the right of the people to amend the Constitution.  *MACo*, ¶ 25.  Requiring the sponsor to spell out every group that might conceivably aid or assist would defeat the purpose of Subsection 3, which is to prohibit the government from taking adverse action against any person, regardless of what "group" that person may belong to, who aids or assists another person in exercising their right to make and carry out decisions about their pregnancy.

¶24     In addition to the issues raised in the Attorney General's Legal Sufficiency Review, he argues in his response to this Court that CI-14 violates the first objective of the separate-vote requirement: avoiding voter confusion and deceit of the public by ensuring proposals are not misleading or the effects of which are concealed or not readily understandable.  *Monforton*, ¶ 10; *MACo*, ¶ 15.  We question whether this Court should consider new arguments raised in defense of a determination of legal insufficiency when those arguments were not articulated in the determination itself, nor appear to form the basis of the determination.  However, we need clarify that avoiding voter confusion is not a standalone basis for finding a constitutional initiative legally insufficient under Article

11

XIV, Section 11, of the Montana Constitution, if the initiative does not otherwise violate the separate-vote requirement by effecting two or more changes to the Montana Constitution that are not substantive and closely related. The objectives of the separate-vote requirement include the avoidance of voter confusion and deceit of the public by ensuring proposals are not misleading or the effects of which are concealed or not readily understandable. *Monforton*, ¶ 10 (citing *MACo*, ¶ 15). In other words, voter confusion is avoided when a constitutional initiative complies with the separate-vote requirement. As we have explained above, CI-14 effects a single change to the Montana Constitution on a single subject: the right to make decisions about one's own pregnancy, including the right to abortion. If CI-14 is placed on the ballot, voters may ultimately agree or disagree with the proposed change that CI-14 offers, but they will be able to understand what they are being asked to vote upon because CI-14 does not effect two or more changes that are not substantive and closely related. If CI-14 is adopted, questions may arise as to its interpretation, but this is true of the entire text of the Montana Constitution and its subsequent amendments, and processes exist to resolve those questions accordingly.

¶25 Having considered the parties' arguments and the Attorney General's Legal Sufficiency Review of CI-14, we hold that the Attorney General erred in concluding that MSRR's proposed ballot issue is legally insufficient because it violates the separate-vote requirement of Article XIV, Section 11, of the Montana Constitution.

¶26 *2. Did the Attorney General exceed his authority by appending a fiscal statement to MSRR's proposed ballot issue?*

12

¶27 MSRR next argues that the Attorney General exceeded his authority under § 13-27-226(4), MCA, by issuing a fiscal statement on CI-14 because the fiscal note that OBPP prepared did not indicate that CI-14 would have a fiscal impact. MSRR asserts that it is improper for the Attorney General to include a fiscal statement with CI-14 where the fiscal note found $0 fiscal impact during the next two years and could not determine the fiscal impact of CI-14 beyond that.

¶28 The Attorney General responds that § 13-27-312(3), MCA, provides him the authority to order a fiscal note and prepare a fiscal statement that must be used on the petition and ballot if CI-14 is placed on the ballot. The Attorney General's reliance on § 13-27-312, MCA, is misplaced since § 13-27-312, MCA, was repealed as part of Senate Bill 93, effective upon signing on May 19, 2023. 2023 Mont. Laws ch. 647, §§ 56, 60.

¶29 Along with repealing § 13-27-312, MCA, SB 93 enacted §§ 13-27-226 and -227, MCA, with parts of each replacing the procedure that had been codified in § 13-27-312(3), MCA (2007-2021).[1] 2023 Mont. Laws ch. 647, §§ 11, 12. Section 13-27-226, MCA, provides the procedure for the Attorney General's review of a proposed ballot initiative and § 13-27-227, MCA, provides the procedure for OBPP to prepare a fiscal note.

---

[1] Section 13-27-312(3), MCA (2007-2021) provided:

> If the proposed ballot issue has an effect on the revenue, expenditures, or fiscal liability of the state, the attorney general shall order a fiscal note incorporating an estimate of the effect, the substance of which must substantially comply with the provisions of 5-4-205. The budget director, in cooperation with the agency or agencies affected by the ballot issue, is responsible for preparing the fiscal note and shall return it to the attorney general within 10 days. If the fiscal note indicates a fiscal impact, the attorney general shall prepare a fiscal statement of no more than 50 words, and the statement must be used on the petition and ballot if the issue is placed on the ballot.

13

¶30   Under § 13-27-227(1), MCA, if a proposed ballot initiative "affects the revenue, expenditures, or fiscal liability of the state, the budget director shall determine whether a fiscal note is necessary." Upon making such a determination, the statute directs the budget director to prepare a fiscal note, in cooperation with the agency or agencies affected by the ballot issue. In this case, OBPP prepared a fiscal note which asserted that CI-14 would have no impact on the revenue, expenditures, or fiscal liability of the state in 2024 and 2025, and it was unable to determine if CI-14 would have any impact in subsequent years.

¶31   Under § 13-27-226(4), MCA, if the fiscal note prepared by the budget director indicates a fiscal impact, the Attorney General shall prepare a fiscal statement of no more than 50 words and forward it to the Secretary of State. The fiscal statement must then be used on the proposal's petition and on the ballot if the proposal is placed on the ballot. In this case, the fiscal note prepared by the budget director does not indicate that CI-14 will have a fiscal impact. OBPP determined that there will be no fiscal impact in fiscal years 2024 and 2025 and it concluded that it was unable to determine any fiscal impact beyond that. Without a determination that a proposed ballot initiative will have a fiscal impact, no fiscal statement by the Attorney General is either warranted or provided for by statute.

¶32   Because the fiscal note prepared by OBPP did not indicate a fiscal impact, the Attorney General lacked the statutory authority to append a fiscal statement to CI-14.

¶33   *3. Do MSRR's ballot statements comply with §§ 13-27-212, and -213, MCA?*

¶34   MSRR requests this Court to declare its proposed ballot statements are compliant with §§ 13-27-212 and -213, MCA. Because the Attorney General did not review MSRR's ballot statements as he found CI-14 legally insufficient, MSRR asks this Court to review

14

the statements, declare that they comply with the relevant requirements, and direct the Attorney General to forward ballot statements consistent with this Court's determination.

¶35 The Attorney General responds that § 13-27-226(3)(a), MCA, provides that the Attorney General shall review ballot statements if he finds a proposed ballot initiative legally sufficient. The Attorney General did not review the ballot statements because he found CI-14 legally insufficient. He argues that, if this Court finds his legal insufficiency determination to be in error, it should apply § 13-27-605(3)(c)(iv), MCA, which provides that if this Court determines that the Attorney General incorrectly determined that a proposed ballot initiative is legally insufficient, "the attorney general shall prepare ballot statements that comply with 13-27-212 and 13-27-213 and forward the statements to the secretary of state within 5 days of the court's decision."

¶36 MSRR argues this Court should instead exercise its original jurisdiction under § 3-2-202(3)(a), MCA, to review MSRR's proposed ballot statements and declare them compliant with §§ 13-27-212 and -213, MCA. It urges the Court to do so because, "[s]uch declaratory relief now would prohibit the A.G. from rewriting the statements on remand and requiring MSRR to initiate another proceeding before this Court." It maintains that the Attorney General had the opportunity to review MSRR's proposed ballot statements and to follow § 13-27-605(3)(c)(iv), MCA, is an "opportunity for creating needless delay" that thwarts the intention that the ballot initiative process be expedient.

¶37 MSRR's reliance on § 3-2-202(3)(a), MCA, is misplaced, as it does not allow the relief MSRR seeks. Section 3-2-202(3)(b), MCA, sets forth the process this Court would follow in resolving a ballot statement dispute. In this instance, as the parties have neither

15

certified the absence of factual issues nor stipulated to a factual record, § 3-2-202(3)(b)(ii), MCA, would require referral to a district court for development of the record—a process which would likely prove less expedient than following § 13-27-605(3)(c)(iv), MCA. We conclude MSRR is not entitled to the declaratory relief it seeks as to the ballot statements. The Attorney General shall comply with § 13-27-605(3)(c)(iv), MCA.

¶38 IT IS ORDERED that the petition for original jurisdiction is ACCEPTED and GRANTED as an original proceeding in the form of a declaratory judgment action under M. R. App. P. 14(4).

¶39 IT IS ORDERED that the Attorney General shall prepare a ballot statement consistent with the applicable statutory requirements and forward the statement to the Montana Secretary of State within five days of this Opinion and Order.

The Clerk is directed to send a copy of this Order to all counsel of record in this matter.

DATED this _____ day of March, 2024.

/S/ INGRID GUSTAFSON

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA

Justice Laurie McKinnon Concurring.

¶40    Preliminarily, Section 11 is one of eleven sections that set forth the way Montana's Constitution may be revised. Its text is simple and straightforward: "If more than one amendment is submitted at the same election, each shall be so prepared and distinguished that it can be voted upon separately." Although Section 11 does not define what is meant by "one" amendment, it is important to note that the text focuses upon the potential *change* to the existing constitution, by requiring that two or more *constitutional amendments* be voted upon separately. In my opinion, the only contention the Attorney General raises which implicates the separate-vote requirement is his argument that CI-14 amends Article II, Section 10, of the Montana Constitution. The Attorney General's contention that subsections 1 and 2 of CI-14 represent independent political choices that require separate votes, that subsection 3 encompasses policy choices divorced from subsections 1 and 2, and that subsection 3 prohibits the State from enforcing valid health and safety regulations are not addressed to the issue of *constitutional revision* which is at the heart of the separate-vote requirement. That is, other than Section 10, the Attorney General has not articulated how political choices, policy choices, or health and safety regulations implicate a *revision* to a particular section of our Constitution or an *addition* of a new constitutional amendment which is not closely related to CI-14. The separate-vote requirement concerns revisions and additions to an existing constitution. Just as we held in *MER* that the question of which offices to include or exclude from an open primary system was not a separate

17

decision point for voters, and did not amount to an additional constitutional amendment, so too is the question of political and policy choices and state regulations. *MER*, ¶ 12.

¶41 In *MACo* we explained that the "proper inquiry was whether, if adopted, the proposal would make two or more changes to the Constitution that are substantive and not closely related[,]" because it would prevent voters from expressing their opinions as to each proposed change separately. *MACo*, ¶¶ 27-28. Furthermore, we explained that "if a proposed constitutional amendment adds new matter to the Constitution, that proposition is at least one change in and of itself." *MACo*, ¶ 28. Then, "if the measure has the effect of modifying an existing constitutional provision, it proposes at least one additional change to the constitution, whether that effect is express or implicit." *MACo*, ¶ 28.

¶42 We explained in *MACo* that "substantive" meant "relating to what is essential" and we adopted several objective factors to guide our "closely related" inquiry. *MACo*, ¶¶ 28-29. We specifically looked to factors identified in *McLaughlin v. Bennett*, 225 Ariz. 351, ¶ 10, 238 P.3d 619 (Ariz. 2010), to inform whether the provisions of a proposed constitutional amendment are "closely related." Those factors include:

> [W]hether various provisions are facially related, whether all the matters addressed by [the proposition] concern a single section of the constitution, whether the voters or the legislature historically has treated the matters addressed as one subject, and whether the various provisions are qualitatively similar in their effect on either procedural or substantive law.

*MACo*, ¶ 29. In a separate amendment challenge, applying these four objective factors assists the Court in determining whether provisions of the proposed amendment are sufficiently related to a common purpose or principle that the proposal can be said to constitute a consistent and workable whole on the general topic. This requires us to look

18

at whether the proposition's positions are topically related and whether they are sufficiently related to form a consistent and workable proposition. As most proposed constitutional amendments will involve one general topic, the topicality requirement is almost always easily satisfied. Thus, the critical question is whether the proposed amendment's various provisions are logically interrelated, using the *MACo* factors we have identified as guidance in determining whether they are closely related.

¶43 Importantly, the focus must remain on whether there has been a *change*, through revision or addition, to the existing Constitution. We recognized in *MACo* that the objective behind the separate-vote requirement is two-fold: to avoid voter confusion and deceit of the public by ensuring proposals are not misleading and to avoid log-rolling or combining unrelated amendments into a single measure. *MACo*, ¶ 15. These are objectives, however, underlying the separate-vote requirement and they do not dictate the inquiry for determining whether a provision adds a constitutional provision or revises an existing constitutional provision. If the appropriate inquiry is applied by examining the *MACo* factors, the objectives behind the separate-vote requirement will be met. The overarching principle is that the initiative only violates the separate-vote requirement if it attempts to revise or add more than two provisions to the Constitution that are not closely related.

¶44 Before addressing the *MACo* factors, it is important to note that while this Court is obligated to ensure voters can cast separate votes for separate amendments, it must, at the same time, apply the separate-vote requirement in a manner that does not encumber the right of the people to amend the Constitution. For the people to realize their right to amend

19

the Constitution, we allow the initiative's sponsor to draft, define, and propose the amendment, subject to the requirements contained in Article XIV. This right would be frustrated if the Attorney General were allowed to defeat the initiative simply because he would have written it differently or prefers a different policy. The right would also be frustrated if we were to find a proposition violated the separate-vote requirement merely because of its specificity, comprehensiveness, or detail. While a proposition's detail and comprehensiveness can prove challenging to evaluate in a separate amendment challenge, applying objective factors will help guide our inquiry and improve the quality of our decision. The *MACo* analysis and factors supply useful tools to stay focused and conduct an objective inquiry on what is nearly always a partisan and politically driven proposition. With these observations made, I turn now to the text of CI-14 and whether, after applying the *MACo* factors, its submission to Montana voters would violate the separate-vote requirement.

¶45   CI-14 expressly amends Article II of the Montana Constitution by adding a new Section 36, providing for the right to make and carry out decisions about pregnancy. Subsection 1 establishes this general right and provides the test under which the government may burden or deny it. Thus, within subsection 1, the right is both established and limited. The standard set forth for burdening the right to procreative autonomy is a "compelling government interest" that is achieved by the "least restrictive means" and is applied routinely to assess alleged violations of fundamental Article II rights. Establishing a standard for burdening the right does not propose a revision to a different section of the Constitution, nor does it add new matter to subsection 1 which is not closely related to the

right Section 36 creates. It is closely related to the establishment of the right and explains the test under which that right may be burdened. Applying the four factors identified in *MACo*, the matter contained in subsection 1 is facially related because they both concern the right to make and carry out decisions about pregnancy. Further, the way the right may be burdened is contained within the same subsection as the creation of the right and thus concerns a single section of the Constitution. Regarding MACo's second factor—whether all the matters addressed by the proposition concern a single section of the constitution—I agree with the Court's conclusion that creating an explicit right such as the right to privacy in Article II, Section 10, and interpreted in *Armstrong*, does not prevent protecting the right of procreative autonomy in other constitutional provisions. Opinion, ¶¶ 13-15. Third, as this Court recognizes, voters and the Legislature have historically treated matters addressed in CI-14 as one subject. Opinion, ¶ 10. Finally, the provisions within subsection 1 affect substantive law in the same way; both pertain to the law surrounding the right to make and carry out decisions about pregnancy. The first provision establishes the right, which the second provision establishes may be burdened under certain circumstances. The provisions within subsection 1 clearly share a logical relationship and comprise a unified pronouncement on the State's constitutional understanding of procreative autonomy. Because the provisions within subsection 1 are qualitatively similar in their effect on substantive law, pertain to the subject of the definition of procreative autonomy, and derive meaning and affect from each other, I would conclude they are qualitatively similar in their effect on the substantive law of procreative autonomy. Accordingly, the provisions and

21

subparts contained in subsection 1 do not constitute more than one constitutional amendment.

¶46    Subsection 2 sets forth a fetal viability limitation on the right created in subsection 1. It provides that the government may regulate the right provided in subsection 1 once a fetus is considered viable, except when medically indicated to protect the life or health of the pregnant patient. Applying the factors identified in *MACo*, subsections 1 and 2, and subparts within those subsections, are all facially related because they define the right of procreative autonomy and place limitations on the right. They concern a single section of the Constitution—a new right of procreative autonomy in Section 36—which creates an explicit constitutional right, in addition to *Armstrong* and Article II, Section 10, which provide for the right in a different manner. Moreover, the voters and legislature have historically treated the matters as one subject area. Finally, the provisions within subsections 1 and 2 affect substantive law in the same way; both pertain to the law surrounding procreative autonomy. Subsection 1 defines the scope of the right and subsection 2 places further limitations upon the right after fetal viability. The provisions within subsections 1 and 2 clearly share a logical relationship and comprise a unified pronouncement on the State's constitutional understanding of procreative autonomy. Because the provisions within subsections 1 and 2 are qualitatively similar in their effect on substantive law, pertain to the subject of the definition of procreative autonomy, and derive meaning and effect from each other, I would conclude they are qualitatively similar in their effect on the substantive law of procreative autonomy. Subsections 1 and 2 constitute the "core" provision of the proposed constitutional initiative. Both are essential

in setting forth and defining the new right created by this proposed constitutional revision. The provisions and their subparts constitute the addition of only one constitutional amendment.

¶47 Subsection 3 secures the right created by subsections 1 and 2 against penalty, prosecution, and other adverse action by the government. Again, when the *MACo* factors are considered, there is a clear logical relationship between the subsections——they comprise a unified pronouncement on the State's constitutional understanding of procreative autonomy, which includes how the right will be protected. The same is true of subsection 4, which defines terms used in the core provisions of subsections 1 and 2 which are necessary to secure the new right against legislative and judicial encroachment. Accordingly, after applying the *MACo* factors, all the subsections and subparts in CI-14 share a logical relationship to each other, define the right to make and carry out decisions about pregnancy, and are a unified pronouncement on the State's constitutional understanding of procreative autonomy.

¶48 In my opinion, application of *MACo*'s objective factors to an initiative is important so the Court remains focused on the analysis necessary for a separate amendment challenge, and is thus consistent in its determinations of when matters are "closely related." Here, while CI-14 is comprehensive, specific, and detailed, that alone is insufficient to defeat the proposition under the separate-vote requirement if application of the "closely related" factors establish CI-14 is a single amendment. After carefully scrutinizing the proposition's text, applying the *MACo* factors, and considering whether the various subparts are closely related to the core subject of procreative autonomy, I would conclude

23

CI-14 has a common purpose or principle that joins its provisions under one proposed constitutional amendment.

¶49 I write separately only to emphasize that in any separate amendment challenge, it is important that the Court's inquiry be conducted consistently, objectively, and fairly. The *MACo* factors, while not exclusive of other considerations, are nonetheless an important tool for achieving this goal. I concur with the Court's resolution of the parties various arguments, but I believe the inquiry and framework I have set forth is necessary in all separate amendment challenges and, thus, have endeavored to provide it.

¶50 I also concur in the Court's resolution of the remaining issues.

/S/ LAURIE McKINNON

Justices James Jeremiah Shea and Dirk Sandefur join in the concurring Opinion of Justice Laurie McKinnon.

/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR

Justice Jim Rice, dissenting.

¶51 I agree with most of the substantive analysis regarding the content of the ballot initiative the Court has provided, but believe there are additional problems that require me to conclude the Attorney General properly determined that the initiative, in its totality, is legally insufficient. CI-14 is a lengthy and complex proposal, one which requires careful examination to comprehend its effects.

24

¶52    Subsection 1 provides a right to make decisions about "one's own pregnancy," including the right to an abortion, which cannot be denied or burdened unless justified by a compelling state interest achieved by the least restrictive means. As the Court explains, the right is stated generally and without restrictions or qualifiers, such as "pre-viability," and therefore I likewise read it as being a right applicable to all pregnancies. Reading Subsection 1 in isolation conveys the impression that it fits within the existing legal framework by employing established concepts of "compelling state interest" and "least restrictive means." However, the analysis cannot stop there, because in Subsection 4, CI-14 adds new definitions that affect these familiar concepts and potentially alter their future meaning. Inserting this definitional language into Subsection 1, it would read:

> (1)    There is a right to make and carry out decisions about one's own pregnancy, including the right to abortion. This right shall not be denied or burdened unless justified by [a government interest that clearly and convincingly addresses a medically acknowledged, bona fide health risk to a pregnant patient *and* does not infringe on the patient's autonomous decision making] achieved by the least restrictive means.

The "*and*" within the inserted definition of compelling state interest, italicized above, and the following phrase subjects a "compelling state interest" to the further requirement that it not infringe upon the patient's "autonomous decision making." "Autonomous" is not a term defined by CI-14, but assigning it the dictionary definition of "undertaken or carried on without outside control," *Merriam-Webster's Collegiate Dictionary* 84 (11th ed. 2012), CI-14 creates tension between what would otherwise be understood as the government's ability to regulate based upon a demonstrated compelling interest, and the right of the patient to nonetheless make decisions autonomously ("without outside control") about the

25

patient's pregnancy, regardless of the strength of any compelling interest. CI-14 does not provide a resolution to this internal conflict.

¶53 Subsection 2, although not so stated, appears to be a subset or exception to the more broadly worded Subsection 1. Subsection 2 addresses government regulation after a pregnancy has advanced to "fetal viability," which is another legal concept familiar to courts. *See Armstrong v. State*, 1999 MT 261, ¶ 49, 296 Mont. 361, 989 P.2d 364 ("Implicit in this right of procreative autonomy is a woman's moral right and moral responsibility to decide, up to the point of fetal viability, what her pregnancy demands of her in the context of her individual values, her beliefs as to the sanctity of life, and her personal situation."). However, CI-14 likewise provides a new definition of this concept which, inserted where it is used within Subsection 2, would read as follows:

> (2) The government may regulate the provision of abortion care after [the point in pregnancy when, in the good faith judgment of a treating health care professional and based on the particular facts of the case, there is a significant likelihood of the fetus's sustained survival outside the uterus without the application of extraordinary medical measures] provided that in no circumstance the government deny or burden access to an abortion that, in the good faith judgment of a treating health care professional, is medically indicated to protect the life or health of the pregnant patient.

The point to be understood here is that, under CI-14, "fetal viability" is not a concept that can be legally determined by the government on the basis of an objective criteria such as a medical metric, but rather must be determined by a treating healthcare professional on a case-by-case basis, and further, that in any event, the government may not burden access to a post fetal viability abortion that is medically indicated, in the judgment of the treating healthcare professional, to protect the life or health of the pregnant patient.

26

¶54   Then, Subsection 3 prohibits the government from penalizing or taking any "adverse action" against a person based upon the outcome or potential outcome of their pregnancy, or against a person who would assist a pregnant person in carrying out a pregnancy decision.   The term "adverse action" is not defined within CI-14, but it appears the provision further limits the government's ability to regulate in this area based upon pregnancy outcomes.

¶55   I read CI-14 as making two or more changes to the Constitution that are substantive in nature, as each Subsection provides a new and at least partially independent substantive concept.   But more, CI-14 alters, or defines in a new way, existing legal concepts and creates an internal, unresolved conflict within its provisions.   As such, it is virtually impossible, in my view, for a voter to fully comprehend the effects of its multiple provisions.

¶56   The purpose of this review is to "avoid voter confusion . . . by ensuring proposals are not misleading or the effects of which are concealed or not readily understandable." *Monforton v. Knudsen*, 2023 MT 179, ¶ 10, 413 Mont. 367, 539 P.3d 1078 (citing *Mont. Ass'n of Counties v. State*, 2017 MT 267, ¶ 15, 389 Mont. 183, 404 P.3d 733).   While we have not previously held this purpose to be a standalone basis to reject an initiative, I believe it is clear that the provisions of CI-14 are not readily understood, have effects that are concealed, and would result in voter confusion this review is designed to prevent.   Most critically, CI-14 contains an unresolved internal conflict. Unfortunately, this appears to be a situation where "less [language] would have been more."

¶57     I would affirm the Attorney General's determination.

/S/ JIM RICE